**In the Matter of CONTINENTAL AIRLINES, INC., et al., Debtors.**

**Bankruptcy Nos. 90–932 through 90–984.**

United States Bankruptcy Court, D. Delaware.

Aug. 6, 1992.

Inc., Houston, Tex., Laura Davis Jones, Wilmington, Del., for debtors.

Michael Mertz, New York City, for Official Committee of Unsecured Creditors.

Todd V. Jones, Richard G. Elliott, Jr., Wilmington, Del., for First Fidelity Bank N.A., New Jersey, Autochton Associates, L.P., State Street Bank and Trust Co. of Conn., Nat. Ass'n.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Movants are Autochton Associates, L.P., aircraft lessor; State Street Bank and Trust Company of Connecticut, debt trustee; and First Fidelity Bank, N.A., New Jersey, Debt Participant; (collectively First Fidelity or Movants) in a leveraged aircraft lease (Lease or Transaction 4030) which has been rejected post-petition by lessee Continental Airlines, Inc. Movants seek immediate payment of an administrative claim based on rent defaults under the Lease and the cost to bring the aircraft into compliance with the Lease return conditions; adequate protection payments based on the aircraft's alleged post-petition decline in value; and retroactive section 1110 status (including full payment of post-petition rent under the Lease) as a remedy for Continental's alleged bad faith determination, and subsequent legal action to establish that the Lease was not subject to section 1110 protection. Finally, Movants filed a Motion in Limine to bar evidence of aircraft lease rates other than that contained in the lease and evidence to support Debtor's claim for setoff. In response Continental argues that Movants are merely entitled to contract damages for breach of the lease agreement. If they are to receive administrative rent, it is limited to a reasonable rent for the actual post-petition-pre-rejection use of the aircraft. Additionally any administrative expense award must be set off by Continental's improvements to two engines. Continental asserts that it acted in good faith when it determined that the Lease was not subject to section 1110 protection.

Joseph F. Nistico, Jr., Zack A. Clement, T. Jay Thompson, Continental Airlines,

For the reasons that follow, the court holds that Movants are entitled to an administrative expense claim for the reasonable use value of the aircraft. Movants are also entitled to a general unsecured claim for contract damages as a consequence of the lease rejection. The granting of these two grounds for relief obviate the need to address the request for adequate protection payments. Continental has not shown its expenditures on the two engines were sufficiently necessary to set off the administrative expense award. Movants' allegations of bad faith were not substantiated at trial. The Motion in Limine is denied in its entirety.

## I. BACKGROUND

People Express Airlines, Inc. entered into an aircraft lease agreement with lessor Equilease Marketing Corporation dated September 15, 1985. The lease covers a Boeing 727–243 Advanced airframe (serial number 21268), three Pratt and Whitney JT8D–9A engines (serial numbers P666317, P666411 and P666171) and all parts and equipment installed on the airframe and engines (collectively aircraft). People Express bought the aircraft, sold it to Equilease who then leased it back to People Express (a sale-leaseback transaction). The Aircraft Lease provides for a quarterly rental of $349,118.51 ($116,373/month). Aircraft Lease, sec. 1.2.

The lessee, lessor and debt trustee have since been replaced by their successors in interest: First Fidelity Bank, N.A., New Jersey (original Debt Participant); Autochton Associates, L.P. (successor to lessor Equilease Marketing Corporation); and State Street Bank and Trust Company of Connecticut (successor to Debt Trustee Connecticut Bank and Trust Company). In 1989 Continental Airlines, Inc. merged with its wholly-owned subsidiary People Express. The surviving entity and successor in interest under the Lease is Continental Airlines, Inc. Continental stopped paying rent under the Lease October 1, 1990.

Continental filed bankruptcy on December 3, 1990. On January 16, 1991 the Debtor moved for a determination that 108 of its aircraft leases (the "disputed leases") were not entitled to section 1110 protection on two grounds: first, it only applies to true leases, not disguised financing leases, and second that it does not apply to "non-acquisition" leases as a matter of law. On January 30, 1991 this court granted Continental's motion on the second ground, declining to reach the first. 123 B.R. 713 (Bankr.D.Del.1991). This ruling was reversed on appeal at both the District Court (125 B.R. 399 (D.Del.1991)) and Court of Appeals level. The Third Circuit held that a non-acquisition sale-leaseback transaction is subject to section 1110 protection if it is a true lease. 932 F.2d 282 (3d Cir.1991). Meanwhile, 107 out of 108 lessors settled for renegotiated leases.

The aircraft was delivered to Avitas Aviation, Inc. on October 31, 1991, who accepted on behalf of First Fidelity. By the time of trial the parties had agreed to stipulate that Transaction 4030 is a true lease. The Debtor's unopposed motion to reject the lease was granted the day of the trial (January 28, 1992).

## II. MOTION IN LIMINE

Shortly after three o'clock in the afternoon of the day before the hearing, Movants filed a Motion in Limine seeking an order from this court:

prohibiting Continental from introducing any evidence or testimony on the following two topics:

(1) rental values from December 3, 1990 to present, except for the rentals [in the Lease]; and

(2) the setoff of alleged value Continental added to the airframe and engines against First Fidelity's administrative claims from December 3, 1990 to the present.

Motion in Limine, p. 1 (January 27, 1992). The motion was to be presented at the hearing.

Movants claimed that Continental was estopped from presenting market rent values:

However, due to Continental's misconduct and misrepresentation to this Court that it had undertaken a Section 1110

analysis, First Fidelity's Section 1110 protections have been rendered negatory [sic]. This Court should not countenance Continental's fraud on First Fidelity and this Court. While, First Fidelity's right to possession within 60 days of December 3, 1990 has been rendered moot, this Court has the equitable power to forge an appropriate relief. Ordering Continental to pay First Fidelity the Lease Rate would be an appropriate remedy in this instance.

Motion in Limine, ¶ 14.

The disputed evidence was admitted at the trial pending this court's post-trial ruling on the Motion in Limine.

An estoppel requires: " '1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; 2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and 3) detrimental reliance by the other party upon the state of things so indic[a]ted.' " *Vertientes, Ltd. v. Internor Trade, Inc. (In re Vertientes, Ltd.)*, 845 F.2d 57, 61 (3d Cir.1988) (quoting *Lovell Mfg. v. Export–Import Bank of the United States*, 777 F.2d 894, 898 (3d Cir.1985)). In post-trial briefing, Movants argued that they had detrimentally relied on the lessee's representation that the lease was subject to section 1110 protection. If it were not, they assert, they would never have entered into the Lease. Movants have not shown by a preponderance of the evidence detrimental reliance.

Sufficient evidence was not presented to support allegations that Continental acted in bad faith when it chose to challenge Transaction 4030's entitlement to section 1110 protection. *See* III. D., *infra*. Therefore, there is no need for the court to use its "equitable power to forge an appropriate relief." The first relief sought in the Motion in Limine is denied.

■ Movants next seek to bar Continental's evidence on its setoff claim on the grounds that there is no basis at law to assert such relief. 11 U.S.C. § 506(c); *In re Golden Plan of California, Inc.*, 829 F.2d 705, 712 (9th Cir.1986) (§ 506(c) applies only to secured creditors). First, Con-

tinental is not claiming a right to a setoff under section 506(c). See III, *infra*. Second, the court finds that there is a legal basis to equitably set off administrative claims. *See* II.C., *infra*. The second relief sought in the Motion in Limine is also denied.

Therefore all evidence presented by Continental at the hearing pending this court's ruling on the Motion in Limine is admitted and properly before the court for its consideration.

## III. DISCUSSION

■ A debtor may reject an unexpired lease of personalty any time prior to confirmation. 11 U.S.C. § 365(a) & (d). To compensate and protect the non-debtor lessor during this period, the Bankruptcy Code provides several safeguards. First, the lessor may claim an administrative expense for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Second, the lessor may seek relief from the automatic stay. 11 U.S.C. § 362(d); *Zagata Fabricators, Inc. v. Superior Air Products*, 893 F.2d 624, 627 (3d Cir.1990) (noting the two alternatives). Third, the lessor may request adequate protection payments. 11 U.S.C. § 361; *Memphis–Shelby County Airport Authority v. Braniff Airways, Inc. (In the Matter of Braniff Airways, Inc.)* 783 F.2d 1283, 1286 (5th Cir.1986) (noting three alternatives but citing split as to third). Finally, at the request of a party in interest, the court may set a date by which time the debtor must assume or reject the lease. 11 U.S.C. § 365(d)(2). First Fidelity has opted for alternatives one and three.

### A. Administrative Expenses

First Fidelity seeks payment of its administrative expense claim based on the Debtor's pre-rejection use of the aircraft and failure to return the aircraft in the condition specified in the Lease. In valuing their claim, Movants argue that the reasonable rent is presumptively that of the lease and the period for which rent is due is the pre-petition default date (October 1, 1990) through the date the Debtor's mo-

**526**

tion to reject the lease was approved (January 30, 1992). Finally, they request immediate payment.

Continental opposes the motion on numerous grounds. First, if Movants are allowed administrative rent, it must be based on a reasonable market rent for that period and equitably set off by Continental's improvement to two of the engines. It must be further reduced by Continental's lack of use of one of the engines, and finally only allowed for the period until Continental returned the aircraft to First Fidelity (October 31, 1991). Continental believes that the administrative expense claim, if payable at all, should be delayed until confirmation. The claim to bring one engine into compliance with return conditions of the Lease is a simple unsecured breach of contract claim.

Section 503(b) provides: "After notice and a hearing, there shall be allowed administrative expenses.... including—(1)(A) the actual, necessary costs and expenses of preserving the estate...." These claims enjoy the highest priority under the Code. 11 U.S.C. § 507(a)(1).

There are two policy concerns underlying the priority administrative expense claim. The first is practical: "By placing creditors who are entitled to payment of these administrative expenses first in line, sections 503 and 507 advance the estate's interest in survival above all other financial goals." *Zagata*, 893 F.2d at 627. The concern for the estate's survival is tempered by the equitable principal of unjust enrichment. "If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services...." *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984) (citations omitted). *Accord Zagata*, 893 F.2d at 627.

Of course, only those expenses that genuinely inure to the benefit of the estate deserve payment ahead of other claimants. The reason one general unsecured creditor is paid ahead of others is that the total value of the estate has been enhanced by that creditor's post-petition contribution, ultimately to the benefit of all general unsecured creditors. If the estate has not benefited, the administrative claim results in unnecessary depletion of assets to the detriment of all creditors. For this reason, Movants must prove the claim rests on a benefit to the estate.

### (1) Benefit to the Estate

The threshold requirement is that the expense is actual and necessary to the preservation of the estate. The benefit must run to the debtor in possession and it is typically fundamental to the conduction of its business. For example, courts easily find possession of a real property leasehold interest to be vital to the survival of the debtor: "rent is clearly an 'actual, necessary' cost of preserving the estate, since the debtor's survival depends on its ability to pay the landlord for the right to possess the space necessary to conduct its business." *Zagata*, 893 F.2d at 627. Employees are equally vital to the debtor's business, and administrative expenses have been awarded for an employee's "direct, necessary medical expenses" arising from a post-petition work accident. *In re Pacesetter Designs, Inc.*, 114 B.R. 731, 735 (Bankr.D.Colo.1990) (but finding greater portion of her claim simply general unsecured). Similarly, post-petition utility services are common subjects of administrative expense awards. *See, e.g., In the Matter of Washington–St. Tammany Electric Cooperative, Inc.*, 111 B.R. 555 (Bankr. E.D.La.1990); *In re Sharon Steel Corp.*, 79 B.R. 627 (Bankr.W.D.Pa.1987) *aff'd Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir.1989). If movants cannot establish a benefit to the estate, "the breach of an executory agreement or lease does not give rise to a claim for administrative expense, but only an unsecured breach of contract claim under section 502(g)." *Memphis–Shelby County Airport Authority v. Braniff Airways, Inc. (In the Matter of Braniff Airways, Inc.)*, 783 F.2d 1283, 1286 (5th Cir.1986) (citations omitted).

Courts differ on the showing a lessor of personalty must make to receive administrative rent. The two seminal cases articulate respectively broad and narrow readings of section 503(b)(1)(A). *In re Fred Sanders Co.*, 22 B.R. 902 (Bankr.E.D.Mich. 1982) (administrative expense claim allowed based on debtor's mere post-petition possession of personalty) and *Broadcast Corporation of Georgia v. Broadfoot, II (In re Subscription Television of Greater Atlanta)*, 54 B.R. 606 (N.D.Ga.1985) (administrative expense claim allowed only for period service benefitted estate but not for service provided which was of no use to estate), *aff'd* 789 F.2d 1530 (5th Cir.1986). Because cases have been thoroughly analyzed in this Circuit in the oft-cited case *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 893–97 (Bankr.E.D.Pa.1987), the court will omit a lengthy discourse and cut to the quick: this court rejects the *Fred Sanders* view. Movants must establish a benefit to the estate to receive priority payment ahead of the other general unsecured claims. *See In re ICS Cybernetics, Inc.*, 111 B.R. 32, 20 B.C.D. 305 (Bankr. N.D.N.Y.1989) (denying lessor's administrative expense claim where computers held in storage post-petition but awarding administrative claim where lessor's property subleased in ordinary course of debtor's business).

■ While mere possession is not sufficient to qualify for an administrative expense under section 503(b), neither must the standard be impossible to meet. Movants need not prove, and the court need not determine, that the personalty was put to its highest and best use. *In the Matter of Thayn Farms*, 117 B.R. 510, 514 (Bankr. D.Neb.1988). All that is required is a showing that the personalty was actually used by the debtor post-petition in the ordinary course of debtor's business. 11 U.S.C. § 364(a); *Pacesetter Designs*, 114 B.R. at 734.

Movants have easily met their burden of showing that the post-petition retention of the aircraft benefitted the estate. By Debtor's own admission, the aircraft was used in the ordinary course of Debtor's

business post-petition until the aircraft was accepted by Avitas on October 31, 1991. The fact that one engine was in service only briefly post-petition, and that the other two engines were in and out of service is immaterial. Continental took the engines out of service for routine maintenance in the ordinary course. As long as the personalty is integrated into the conduct of debtor's business, the court will find a benefit. It would be impossible for the court to determine a use value for every discrete component covered by the lease. *See Thayn Farms*, 117 B.R. at 514.

(2) Return Conditions

■ Movants have also claimed as an administrative expense their cost to bring the aircraft into compliance with the lease. *United Trucking Service, Inc. v. Trailer Rental Co., Inc. (In re United Trucking Service, Inc.)*, 851 F.2d 159 (6th Cir.1988). The *United Trucking* Court held that the debtor's failure to maintain and repair trailers in accord with the lease obligations resulted in a monetary benefit to the estate. *Id.* at 162. "Accordingly, the damages under the breached lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were properly accorded priority under § 503 to [the lessor]." *Id.*

The problem with this analysis is that once the lease is rejected (and it had been deemed rejected in *United Trucking*), the bankrupt estate is no longer bound by its terms. *Sharon Steel*, 872 F.2d at 40 (debtor's rejection of service agreement relieves both parties from "their respective obligations under the contract") (emphasis omitted). Accordingly, the debtor is only liable for breach of the lease covenants as a general unsecured claim. 11 U.S.C. 365(g). *See also In re Dant & Russell, Inc.*, 853 F.2d 700, 702 (9th Cir.1988). Under *United Trucking* virtually any breach of the rejected lease covenants would be converted to an administrative expense claim. The failure to expend estate money to satisfy lease obligations is presumed to result in that money's availability to the estate. This analysis omits the "actual, necessary" requirement of section

**528**

503(b)(1)(A). "Section 503(b)(1) limits the valuation of administrative expenses to the actual and necessary cost and expense of preserving the estate." *Sharon Steel,* 872 F.2d at 38. Movants must show that the failure to return the aircraft in compliance with the Lease return conditions resulted in a benefit to the estate.

Return conditions are detailed in the Lease. Distinctive markings of the Lessee must have been removed from the airframe. "Each Engine shall have not less than 2,000 hours and cycles before the next engine limiting condition ... and the aggregate time remaining for all Engines on the aircraft shall be not less than 9,000 hours and cycles...." Sec. 3.10. If the airframe or any engine is not in compliance with a return condition the lessee shall compensate the lessor for the "then current cost of overhaul ... by a reputable maintenance facility." *Id.*

Movants presented the testimony of Mr. Fletcher D. Arrington, Director of Technical Services for Avitas Aviation. He testified that the airframe and one of the engines were not in compliance with the return conditions of the lease: engine 666317 did not have the stipulated value of hours and cycles and the airframe still bore Continental's logo. Tr. at 156. (Some terms of art: 1 cycle is 1 landing; 2–3 cycles are the equivalent of approximately 2½ flying days. An engine is "run out" when the life limited parts are used up. There may still technically be a nominal number of hours and cycles remaining.) It would cost Movants approximately $575,000 to have engine 66317 brought into compliance with the lease return conditions and $5,000 to paint out Continental's logo on the airframe, for a total of $580,000.

Continental presented the testimony of Mr. Mark Fabian, a project manager at Continental's Aircraft Acquisitions Engineering Group. He testified that Continental would be willing and able to bring engine 666317 into compliance with Lease return conditions for $306,000 (Continental's average cost for a 3,000 cycle engine). Tr. at 184. Continental's in-house costs are

admittedly much lower than the outside retail rates available to First Fidelity.

Upon delivery to Avitas, two of the three engines were in compliance with the Lease Return conditions and one was not. Once the third is brought up to the minimum 2,000 cycles, the three will meet the required aggregate under the Lease of 9,000 hours and cycles.

Movants have not borne their burden of proof on entitlement to an administrative expense claim for the breach of the lease return conditions. There was no showing that failure to bring engine 666317 into compliance with the lease return conditions resulted in a benefit to the estate. Similarly, there was no showing that the failure to paint out the Continental logo on the airframe resulted in a benefit to the estate.

### (3) Valuation

■ Once benefit is established, the court must value the benefit. The key to valuation of an administrative expense claim is a recognition of its equitable rather than legal nature. The claim is valued on use, not the lease or contract terms. *Thayn Farms,* 117 B.R. at 513–14. "Because bankruptcy proceedings are considered to be equitable, however, the landlord's right to collect monetary relief is somewhat curtailed: a debtor is generally required to pay only a reasonable value for the use and occupancy of the landlord's property, which may or may not equal the amount agreed upon in the terms of the lease." *Zagata,* 893 F.2d at 627 (citation omitted).

When valuing administrative rent, some courts hold that the lease rate is presumptively the actual and necessary cost of preserving the estate even though the rejected lease terms do not bind the estate. *See, e.g., Union Leasing Co. v. Peninsula Gunite, Inc. (In re Peninsula Gunite, Inc.),* 24 B.R. 593, 595 (9th Cir.B.A.P.1982); *In the Matter of Thayn Farms, Inc.,* 117 B.R. 510, 514 (Bankr.D.Neb.1988) (lease terms presumptively reasonable unless contrary evidence presented on use value of personalty). It is not clear why courts should favor a lease term over current market rates, when the rejected lease was typically

negotiated many years prior to the pertinent filing date.

In *Sharon Steel* a provider of natural gas (National Fuel) argued that the bankruptcy court erred when it applied a lower rate than that of the rejected executory contract in valuing National Fuel's administrative claim for fuel provided the debtor post-petition. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 42 (3d Cir.1989). The Court of Appeals for the Third Circuit affirmed the selection of a lower rate schedule than that provided by the service agreement because "Sharon would have been charged at the [lower] rate had the service agreement expired by its own terms [post-petition]." *Id.* at 42.

■ Continental presented the testimony of its Chief Financial Officer, Mr. Michael Cox, on the issue of the market lease rate for the aircraft. Mr. Cox was one of four men intimately involved in the valuation of Continental's fleet and negotiation of new leases with the 107 lessors who settled. He had been previously qualified as an expert by this court based on his experience in the industry. Mr. Cox placed the market lease rate at $68,000/month on the basis of discussions with "the leasing community." Tr. at 217.

Unfortunately there are no comparable "lease-ins" (leases of aircraft to Continental) for this post-petition period. However, this court has recently approved ten "lease-outs" (leases of aircraft from Continental) of similar aircraft from Continental to Delta at $75,000/month. Mr. Cox considered the lease to Delta to be above market rate, but acceptable to Delta because it had such immediate need for the aircraft. The only other evidence of lease rates presented at the hearing was the renegotiation of 107 out of 108 disputed leases for approximately $92,000/month. Finally, there is the actual Lease rate of $116,373/month, negotiated at arms length in 1985.

Movants were barred from presenting evidence on fair market rent by their failure to disclose their expert prior to the hearing. (He was only made available for deposition late in the afternoon prior to trial, when opposing counsel was to meet with his own witnesses to prepare them for the hearing.) Movants instead moved the admission of expert testimony on aircraft market value presented at the September 3, 1991 adequate protection trial. This evidence was admitted and argued in post-trial briefing.

Even if the rent reserve of the lease were presumptively reasonable, that presumption was effectively overcome by the contrary evidence before the court. Every other post-petition lease transaction presented was for substantially less. There is the fact that 107 out of 108 aircraft lessors and financiers were willing to renegotiate their leases to approximately 80% of the original payments called for under the various leases. From this it may be inferred that Continental's air frame and equipment leases, generally, were above market rate. Unfortunately this value is not useful as a comparable because it is the result of a negotiated settlement with substantial concessions on both sides.

The $68,000/month reasonable rent proposed by Mr. Cox appears to be a low estimate. For one thing, no evidence was presented of a lessor who would accept such a rent. The market talk Mr. Cox relied on as the basis for this value was not supported by concurrent transactions, as some of the other values before the court were. On cross-examination First Fidelity emphasized the speculative nature of this figure: it appeared to be one in a series of possible values Mr. Cox and his co-workers were investigating as what Continental could afford to pay.

■ Movants' evidence on aircraft market value from the September 3, 1991 adequate protection trial is irrelevant to what a prospective lessee would pay. It is analogous to the replacement value approach rejected in *In re Executive House Assocs.*, 99 B.R. 266, 278 (Bankr.E.D.Pa.1989) ("The replacement cost approach was viewed by both appraisers as irrelevant to the concerns of a hypothetical prospective buyer."). Replacement cost, like market value, should only tangentially concern a hypothetical lessee. Similarly the allegation that the aircraft declined in value post-

petition (testimony of Movant's expert at the September 3–5, 1991 trial) does not necessarily mean that the lease rate decreased proportionately.

Fortunately there are the ten aircraft leases entered into between Delta and Continental in late 1991 at $75,000/month. Although Mr. Cox testified that this was above market rate, it appears to be the closest thing to a comparable transaction before the court. Indeed it is the closest value to "what any other customer would have to pay under the same circumstances." *Sharon Steel*, 872 F.2d at 42 (citation omitted). *See also Wheeling–Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling–Pittsburgh Steel Corp.)*, 122 B.R. 29, 32 (Bankr.W.D.Pa. 1990) (valuing post-petition utility service for administrative expense claim by examining rate schedules for customers "with demand level similar to the Debtor."). Given the evidence presented at trial and the transactions put on the record, this court finds the reasonable monthly use value of the aircraft to be $75,000/month.

### (4) Administrative Claim Period

The next issue is for what post-petition period is administrative rent due. Movants argue that they are entitled to the entire amount the Debtor is in default, including pre-petition arrearages, until this court approved the rejection of the Lease. Continental argues that the administrative rent should be awarded from the petition date until the plane was delivered to Avitas.

There are two theories as to whether administrative rent should be awarded until the debtor relinquishes possession or until the rejection is approved by the court. On the one hand, section 365 requires court approval of any rejection, so a purported rejection, or anything less than court sanction would not be legally effective. The creditor has a right to the protection of a court order prior to taking steps to mitigate damages, for example, by re-letting the property. If the lessor relet the subject of the lease and the rejection was subsequently not approved by the court, the lessor would be in violation of the auto-

matic stay. *Matter of Federated Dept. Stores, Inc.*, 131 B.R. 808, 815 (S.D.Ohio 1991) (citing *In re Revco D.S., Inc.*, 109 B.R. 264, 269 (Bankr.N.D.Ohio 1989)).

On the other side, some courts have held that the gap period ends when the lessor accepts possession of its property, even if the court ordered rejection occurs at a later date. It is impossible to show the required benefit to the estate if the lease subject is no longer in the debtor's possession. *See, e.g., United Trucking*, 851 F.2d at 163 (leased trucks stolen pre-petition not subject to administrative expense award). If mere possession of personalty is not enough to trigger administrative rent, it would be inconsistent to allow an administrative expense claim after the debtor has returned the property to the lessor. Accordingly, administrative rent is only awarded from the petition date until Avitas accepted delivery of the aircraft (December 2, 1990 through October 31, 1991).

### (5) Setoff

The next question is whether the Debtor may equitably set off the administrative expense claim with its improvements to two engines. Continental argues that the administrative expense must be based on a "net" benefit to the estate and that Movants would be unjustly enriched to the extent they recover administrative rent plus improved engines.

The only valid offset to an administrative expense claim would be a necessary expenditure by the debtor prior to use of the creditor's property. In essence, the debtor would have to make the same showing an administrative claimant must under section 503(b)(1)(A): that the costs were "actual [and] necessary." It would be inequitable and inconsistent to hold Movants to a strict standard for entitlement to an administrative expense yet allow the debtor to set off the award with virtually any post-petition expenditures.

Continental presented unopposed evidence of the condition of each of the three engines on the petition date and acceptance date. From these two values Continental calculated the net hours and cycles added

or consumed post-petition. Engine 666171 was run out with 0 hours and 0 cycles on the petition date, received maintenance post-petition in the ordinary course of Continental's business and then was put back in service. Upon acceptance by Avitas the engine had 28,742 cycles and 16,307 hours. Engine 666441 had 827 hours and 441 cycles as of the petition date, was used post-petition until April 1991 until it was put in line for routine maintenance. It came out of maintenance in September and was returned to the lessor the following month. Upon acceptance by Avitas the engine had 6,063 hours and 3,045 cycles. Finally, engine 666317 had 4,778 hours and 36 cycles as of the petition date. It was in service for three days post-petition at which point it was put in line for maintenance which it never received. Upon acceptance by Avitas the engine had 4,750 hours and 23 cycles.

There was conflicting testimony about exactly what is required to bring an engine to "zero time." Zero time is where all of the life limited components have all their times or cycles remaining. Tr. at 165. According to Mr. Arrington, an engine would need new C–1 and C–2 disks to be zero timed, and it would cost $900,000 to bring an engine to that highest standard. *Id.* Mr. Fabian testified that new C–1 and C–2 disks are not required to reach zero time. Tr. at 178. Both agreed that the C1 and C2 disks are not an issue when discussing the return conditions under the lease. Tr. at 179.

Movants dispute the alleged value conferred on their aircraft as a result of the post-petition maintenance. It was not clear from the evidence how Continental arrived at the value for its "Total Cost of Post–Petition Overhaul." If it is market value, Continental would be charging First Fidelity a premium over its actual in-house costs, which are admittedly lower than market costs. If any value is relevant to an equitable setoff, it is actual cost, the same standard applied to value section 503(b)(1) administrative expenses.

Continental's claim for a setoff to Movants' administrative expense award is premised on engine work performed in the ordinary course of Debtor's business which they then never needed. They have reduced their claim for setoff to the extent they consumed the improvements. Therefore, almost by definition these improvements were of no value to the estate. If Continental over-improved the engines unnecessarily, it is not clear why First Fidelity should pay the price. The court holds that Continental cannot set off First Fidelity's administrative expense award with the improvements to engines 666171 and 666411.

### (6) Timing of Payment

■■■■ The timing of payment of an administrative claim is at the sound discretion of the court. *In re Chips & Twigs, Inc.*, 58 B.R. 109, 110–11 (Bankr.E.D.Pa. 1986). Most courts postpone actual payment until confirmation of a plan. See, e.g., *In re Cardinal Indus., Inc.*, 109 B.R. 738 (Bankr.S.D.Ohio 1989) (payment of post-rejection rent claims and all other administrative claims should be deferred to confirmation); *In re Budget Uniform, Inc.*, 71 B.R. 652, 654 (Bankr.E.D.Pa 1987) (administrative claims "must wait for confirmation of a plan before becoming entitled to payment"). To qualify for exceptional immediate payment, a creditor must show that "there is a necessity to pay and not merely that the Debtor has the ability to pay." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 178–79 (Bankr.S.D.N.Y.1989). Movants have not shown they are entitled to payment ahead of other administrative claimants.

### B. *First Fidelity's Breach of Contract Claim*

■■■■ The rejection of a lease under section 365(d)(2) relates back to the date immediately prior to the filing date. 11 U.S.C. § 365(g)(1); *Aslan v. Sycamore Inv. Co. (In re Aslan)*, 909 F.2d 367, 371 (9th Cir.1990). "[Section] 502(g) also provides that any claim, e.g. a claim for breach of the lease, which arises as a result of rejection under [section] 365 shall be treated the same as if such claim had arisen before the date of the filing of the petition." *Kopo-*

532

low v. P.M. Holding Corp. (In re Modern Textile, Inc.), 900 F.2d 1184, 1191 (8th Cir. 1990). Because the rejection constitutes a pre-petition breach, the damages are paid with other general unsecured claims. See Air Line Pilots Ass'n Int'l v. Continental Airlines Inc. (In re Continental Airlines Corp.), 901 F.2d 1259, 1260 (5th Cir.1990). Damages are determined under applicable state law. Landsing Diversified Properties–II v. First Nat'l Bank and Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.), 922 F.2d 592 (10th Cir.1990).

■ The Lease provides that New York State law governs. Aircraft Lease, Sec. 10.10. In Greasy Spoon Inc. v. Jefferson Towers, Inc., the Court of Appeals of New York had the occasion to discuss breach of lease damage claims and lease provisions limiting the parties' remedies under the lease. 75 N.Y.2d 792, 552 N.Y.S.2d 92, 551 N.E.2d 585 (1990). The tenant sought injunctive relief and lost profit damages for breach of the landlord's obligations under the lease. Landlord sought dismissal on the equitable grounds that plaintiff was not in compliance with the lease either. Finding the breached covenants to be independent, the lower court found for the tenant. On appeal the New York Court of Appeals affirmed after an analysis of the remedies available under the lease. The Court held that the lease only permitted limited specific remedies for the covenant the tenant breached, therefore the landlord could not assert the breach as a defense in the tenant's suit. The covenant the landlord had breached was not limited under the lease to specific remedies or damages, therefore, general contract damages were available.

The Lease describes what modifications the lessee may make to the aircraft, who those modifications belong to and what condition the aircraft must be in upon return to the lessor. Mandatory replacement parts, improvements and modifications shall "automatically vest in the Lessor." Lease at sec. 3.5. However, the lessee may make voluntary improvements or modifications to the aircraft as well. Whether title to the improvement vests in the lessor or

lessee depends on whether the improvement is readily removable without material damage to the Aircraft. If they are not readily removable, they "become accessions to the Aircraft and the property of the Lessor." Id. Finally, "[i]n the event that the Lessee shall not have removed any addition or improvement that it may be entitled to remove pursuant to Section 3.5 hereof, such addition or improvement shall become the property of the Lessor." Sec. 3.10.

Movants are entitled to breach of contract damages for their cost to bring the aircraft into compliance with the Lease return conditions. Mr. Arrington testified that it would cost $575,000 to bring engine 666317 up to 2,000 cycles—the lease minimum per engine. Since the remaining two engines have well in excess of the requisite hours and cycles, the three together will exceed the aircraft minimum. Movants are to be compensated at their actual cost, as long as it is reasonable, and there was no evidence that it is not. The only contrary cost evidence for engine maintenance is not for comparable market rate services; it is essentially for cost. Movants are definitely not required to return the engine to Continental for maintenance now that they finally have it in their possession.

■ Movants are entitled to total breach of contract damages of $580,000. This is a general unsecured claim, not an administrative expense.

■ The remaining question is whether Continental will be entitled to set off this general unsecured claim with its improvements to engines Nos. 666171 and 666411. New York state law provides that where the parties have limited their remedies under the lease the agreement controls. Under the Lease, improvements which are not removed or removable become property of the lessor. This provision limits Continental's right to recovery or a setoff from First Fidelity based on improvements beyond the specified return conditions. Therefore, Continental is not entitled to offset Movants' general unsecured claim for rejection damages by the engine improvements.

## C. Adequate Protection Payments

▪ Movants also seek adequate protection payments for the post-petition decline in market value of the aircraft. Courts are split on the issue of whether lessors are entitled to adequate protection payments. *See, e.g., In re Wheeling–Pittsburgh Steel Corp.*, 54 B.R. 385 (Bankr. W.D.Pa.1985), *aff'd* 67 B.R. 620 (W.D.Pa 1986) (lessor not entitled to receive periodic payments from debtor to cover deterioration in market value of equipment); *In re Reice*, 88 B.R. 676, 683 (Bankr.E.D.Pa. 1988) (extensive analysis of applicable case law supporting holding that lessor of personalty entitled to seek relief under § 363(e)).

There is no need to reach the issue on these facts as it would be inequitable to award both adequate protection payments and administrative rent. Movants are legally precluded from seeking adequate protection payments as secured creditors having stipulated to the fact that transaction 4030 is a true lease rather than a financing lease.

## IV. SECTION 1110

### A. Continental's Bad Faith

▪ Movants allege Continental acted in bad faith in denying transaction 4030 section 1110 protection. A good faith standard is implicit in the Bankruptcy Code. *In the Matter of Young*, 76 B.R. 376, 378 (Bankr.D.Del.1987). Bad faith may be grounds for dismissal of a case. *First National Bank of Sioux City v. Kerr (In re Kerr)*, 908 F.2d 400, 404 (8th Cir.1990). While Movants are not seeking anything as serious as dismissal, they are in effect seeking money damages of the full contract lease rate as an administrative expense ($1,861,970.70 for October 1, 1990 through January 28, 1992).

Movants did not present a witness on this issue at the trial. There were a few questions here and there but generally Movants' witnesses declined to infer bad faith. Movants argue bad faith may be inferred from the entire record of transaction 4030, both before and after filing: prior to bankruptcy, People Express agreed

the Lease would be subject to section 1110 protection whereas the debtor in possession claimed it was not.

In one interrogatory the Debtor admitted it had not performed the analysis necessary to determine whether or not the various aircraft leases are or are not "true leases." This also is not conclusive evidence of Continental's bad faith. The Debtor challenged section 1110 status on two grounds, one factual (was the particular transaction a true lease or a financing lease) and the other purely legal (does section 1110 apply to so called non-acquisition leases).

Finally, with so many airlines filing for Chapter 11 protection, section 1110 litigation continues. It is no different from other litigation debtors undertake against various creditors of the estate. "Determining bad faith, however, requires a difficult distinction between permissible and impermissible motives. Debtors often wish to shelter whatever assets they can from their creditors, and the Bankruptcy Code permits them to do so." *Id.* One way to shelter assets is to challenge a creditor's entitlement to protection under the applicable code section.

### B. Retroactive Section 1110 Status

▪ Movants also argue they are now entitled to retroactive section 1110 status as a consequence of Continental's belated stipulation to Transaction 4030's true lease status. Continental stipulated to the fact that the Lease was a true lease for the purpose of this litigation. The stipulation is not retroactively binding on the parties, certainly not with respect to rights already foreclosed. Section 1110's purpose is to allow a lessor to repossess its personalty if the lessee-debtor does not comply with its lease; the section does not mention an absolute right to payment or priority or classification of the missed lease payments. *But see GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503 (11th Cir.1985).

## V. CONCLUSION

An order in accordance with this Memorandum Opinion is attached.

534

## ORDER

AND NOW, August 6, 1992, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. First Fidelity's Motion in Limine is DENIED.
2. First Fidelity's motion for administrative rent is GRANTED. Rent is due for the period December 3, 1990 through October 31, 1991 at the rate of $75,000 per month. This amount is payable at confirmation.
3. First Fidelity's motion for payment of breach of lease damages as an administrative expense is DENIED. They are payable as a general unsecured claim in the amount of $580,000.
4. Continental's motion for an administrative setoff is DENIED.