**In re INTEGRATED HEALTH SERVICES, INC., et al., Debtors.**

**No. 00–389 MFW to 00–825 MFW.**

United States Bankruptcy Court, D. Delaware.

Jan. 30, 2003.

James A. Patton, Robert S. Brady, Edward L. Morton, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, Michael J. Crames, Arthur Steinberg, Marc D. Rosenberg, Kaye, Scholer, Fierman,

Hays & Handler, LLP, New York City, Charles P. Greenman, Mitchell H. Perkiel, Cory M. Goffin, Jenkins & Gilchrist Parker Chapin, LLC, New York City, for Debtors & Plaintiffs.

Joanne B. Wills, Steven K. Kortanek, Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Wilmington, DE, Glenn Rice, William Silverman, Otterbourg, Steindler, Houston & Rosen, PC, New York City, for Official Committee of Unsecured Creditors.

John D. Demmy, Stevens & Lee, P.C., Wilmington, DE, Leighton Aiken, Owens, Clary & Aiken, LLP, Dallas, TX, for Litchfield Investment Company, LLC.

Richard W. Riley, Margery N. Reed, Duane Morris, LLP, Wilmington, DE, for GMAC Commercial Mortgage Corporation.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Motion of Litchfield Investment Company, LLC ("Litchfield") to Compel the Debtors' Specific Performance of Contractual Obligations and the Debtors' opposition thereto. The Motion seeks an order compelling the Debtors to pay Litchfield rent for the period that the Debtors continued to occupy the premises after the Debtors rejected their leases with Litchfield. Hearings were held on May 9 and 13, 2002, and the legal issues were briefed by the parties. For the reasons set forth below, we grant the Motion and determine that the Debtors are obligated to pay Litchfield as fair use and occupancy $20.8 million per annum, prorated for the post-rejection period

1. This Opinion Constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

that the Debtors continued in possession of the premises.

## I. *FACTUAL BACKGROUND*

On February 2, 2000, Integrated Health Services, Inc. ("IHS") and certain of its direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Prior to the petition date, on or about August 31, 1994, Integrated Health Services of Lester, Inc. ("Lester") had entered into leases with the predecessor of Litchfield for 43 premises, 41 of which were operated as nursing homes and 2 as assisted living facilities. The Leases were guaranteed by IHS. (Lester and IHS are collectively referred to as "the Debtors.") When the facilities were conveyed to Litchfield in 1997, the 1994 leases were terminated and new leases ("the Leases") were executed effective as of October 1, 1997. The term of the Leases was 11 years. The Base Rent due under the Leases was equivalent to the mortgage payments due by Litchfield to its financier—almost $15 million per year. (Exhibit B–12 at § 3.2(a).) In addition to the Base Rent, the Debtors were obligated to pay Litchfield on a monthly basis Refundable Lease Deposits, which aggregated in excess of $4.1 million per year. (*Id.* at § 4.1.) At the commencement of the 1997 Leases, the Debtors were also given credit (as Refundable Lease Deposits) for $32 million they had paid under the 1994 Leases. (*Id.*)

The parties also executed a Participation Agreement and a Purchase Option Agreement pursuant to which the Debtors were entitled to share in any appreciation in the value of the facilities during the time that they operated there and had the right to purchase the facilities under certain conditions.

In the event the Debtors did not choose to purchase the facilities, the Debtors were entitled to a return of the Refundable Lease Deposits paid by them (subject to certain adjustments). (*Id.* at § 4.2.) The adjustments included a deposit due from the Debtors at the end of the Leases of $29 million, which Litchfield was entitled to keep if the facilities were not worth more than $215.6 million. If, however, the Debtors breached the Leases or terminated them early, Litchfield was entitled to keep the Refundable Lease Deposits and to sue the Debtors for all other obligations due under the Leases. (*Id.* at § 4.2(b).)

Subsequent to filing their bankruptcy petition, the Debtors continued to pay Litchfield the Base Rent and the Refundable Lease Deposits on a monthly basis. Ultimately, the Debtors filed a Motion to reject the Leases and an Order approving the rejection of the Leases was entered effective as of December 26, 2001. However, because of regulatory requirements, the Debtors continued to operate the facilities post-rejection while they (and Litchfield) tried to find new operators. After substantial wrangling, the Debtors ultimately allowed the transfer of the facilities to new operators identified by Litchfield, including the transfer of the Debtors' provider number.[2] The facilities were transferred effective November 1, 2002.

---

2. In other similar transfers, the Debtors had assigned their provider number with the agreement of the United States on payment or forgiveness of debt arising from overpayments received by the Debtors pre-petition and often with the agreement of the new operator (or the applicable landlord) to pay for the transferred assets. In the absence of transfer of the provider number, the new operator would have to close the facility or operate it without receiving any reimbursement from the government for the services provided until it could get a new provider number. In this case, Litchfield's refusal to pay what the Debtors' thought was a fair price and the issue regarding the treatment of the Refundable

On January 3, 2002, Litchfield filed the instant Motion seeking to compel the Debtors to pay rent at the amounts set forth in the Leases for the period after the Leases were rejected but before the Debtors left the premises. We directed that the Debtors continue to pay all obligations due under the Leases, including the Refundable Lease Deposits, until further order. On May 9 and 13, 2002, we held an evidentiary hearing on the amount, if any, the Debtors would be obligated to pay Litchfield for their use and occupancy of the premises after rejection of the Leases. The parties have submitted post-hearing briefs.

In addition to the Motion *sub judice*, the Debtors have filed an adversary proceeding against Litchfield. The Complaint seeks relief under section 542 (turnover of property of the estate), section 549 (turnover of post-petition payments), and section 502(b)(6) (which caps a landlord's prepetition claim for rejection damages). The Debtors also filed a Motion for Partial Summary Judgment in the adversary proceeding, seeking, *inter alia*, a declaration that the Refundable Lease Deposits are an unenforceable penalty provision because on default the Debtors lose all right to a return of them while otherwise they would be returnable at the conclusion of the Leases. As a result, the Complaint sought an order directing the turnover of all Refundable Lease Deposits made by the Debtors both pre and post-petition, which to the effective date of the rejection of the Leases total in excess of $50 million. Litchfield filed a response disputing the Debtors' characterization of the Refundable Lease Deposits as a penalty or forfeiture and asserting instead that they are a component of the rent due each month by the Debtors. Argument on the Debtors'

Motion for Partial Summary Judgment was heard on May 13, 2002, at which time we denied the Motion, concluding that the Leases are ambiguous and that there were substantial disputed facts relating to the characterization of the Refundable Lease Deposits. The parties have consequently proceeded with discovery, and trial in the adversary is currently scheduled for April 4, 2003.

## II. *JURISDICTION*

This Court has jurisdiction over this matter, which is a core proceeding, pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), (M), and (O).

## III. *DISCUSSION*

 When a lease has been rejected and the debtor continues to use the property, the landlord is entitled to an administrative claim for the "fair use and occupancy" of the premises. *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 42 (3d Cir.1989); *In re Continental Airlines, Inc.*, 146 B.R. 520, 530 (Bankr.D.Del.1992). The amount due for fair use and occupancy is the fair rental value of the property at the time of rejection. *See, e.g., Sharon Steel*, 872 F.2d at 42 (administrative claim calculated at what debtor would have been charged had the rejected contract expired on its own terms); *Continental Airlines*, 146 B.R. at 529–30 (administrative rent determined after consideration of comparable lease rates close to time of rejection).

Some courts have held that there is a presumption, subject to rebuttal, that the rent set forth in the lease is the market rent. *See, e.g., In re Thompson*, 788 F.2d 560, 563 (9th Cir.1986); *In re Schnabel*, 612 F.2d 315, 318 (7th Cir.1980); *In re*

Lease Deposits delayed transfer. Ultimately, however, the facilities were transferred to

new operators without any disruption in services to the residents.

*F.A. Potts & Co., Inc.*, 137 B.R. 13, 18 (E.D.Pa.1992). *But see, Continental Airlines*, 146 B.R. at 528–29 ("It is not clear why courts should favor a lease term over current market rates, when the rejected lease was typically negotiated many years prior to the pertinent filing date").

We need not decide whether the lease rate is presumptively the fair rental value of the facilities for two reasons. First, both parties presented expert testimony on the fair rental value of the Litchfield facilities. Second, we cannot determine what the lease rate is until we decide the issue presented in the adversary, namely whether the Refundable Lease Deposits are part of the rent due under the Leases. Consequently, we render this decision based on the evidence presented by the parties on the current fair rental value of the facilities.

The Debtors' expert, Michael Bates, opined that the fair rental value was between $8 and $10 million per year, based on his conclusion that it should be no more than 50% of EBITDAR. (Exhibit D–4.) In contrast, Litchfield's expert, James Tellatin, opined that the fair rental value was $20.8 million per year, concluding that fair rental values are approximately 95.7% of EBITDAR[3] (or 70 to 85% of EBITDARM—earnings before interest, taxes, depreciation, amortization, rent and management fees). (Exhibit L–24.)

Based on the testimony and reports presented, we are unable to accept the testimony of the Debtors' expert as reliable. That expert had limited experience doing appraisals of the fair rental value of nursing home facilities. In addition, his "market" analysis was limited to consideration of analyses he or his company had done and did not consider any appraisals or analyses performed by anyone else. Further the "comparables" selected by him were not similar to the facilities at issue here (but were instead senior housing and hospitals), while appraisals he *had* done of nursing homes were inexplicably not considered by him in doing his analysis in this case. His analysis is subject to further question since the "comparable" analyses had been done for his own clients on a confidential basis and, consequently, he did not provide the backup documentation to confirm these numbers. As a result, we conclude that the market comparison on which the Debtors' expert relied was too small, restricted, and unconfirmable a sample to be reliable.

Further, the Debtors' expert based his opinion on the Debtors' projections for 2002, without any analysis or comparison to the historical performance of the Debtors or to the performance of any other operator in the industry. However, the Debtors' projections are questionable. They not reliable in large part because they are not based on the Debtors' historical performance on a facility by facility basis nor are they based on results obtained by others in the industry.

Among the problems with the projections which were raised on cross examination of the Debtors' representative was the fact that the Debtors' projections included management fees of 5% where they had historically been only 3.9%. By far the most questionable aspect of the Debtors' projections was the large increase (over $5.7 million) in malpractice costs. This was necessary, the Debtors' representative testified, because they were unable to obtain medical malpractice insurance. How-

---

**3.** Litchfield's expert opined that if the Debtors' EBITDAR were increased to reflect what a new operator (who was not in bankruptcy) could achieve with the Debtors' mix of patients at the facilities in question, the fair rental value of $20.8 million would represent only 87% of that EBITDAR.

ever, the Debtors prepared the projection in-house at the corporate level without any input from either their insurance consultants or their operational people on site at the facilities in question. Further, the projection was not based on the Debtors' historical claims at the Litchfield facilities but on claims of all the Debtors' facilities, without any analysis as to whether the facilities at issue here had a better or worse claim experience than other facilities.

As a result, the reliance of the expert on the Debtors' projections without any testing essentially leaves it solely within the Debtors' power to "set" the rent for these facilities. Such a result is not consistent with determining the fair rental value of a facility based on the free market. Therefore, we conclude that the reliance of the Debtors' expert on the Debtors' projections, without considering the actual historical performance of these Debtors (or anyone else in the industry), was not reasonable.

Finally, the methodology used by the Debtors' expert is suspect because it is not a methodology that is used by any other experts in valuation of nursing home facilities. The Debtors' expert admitted that there was no literature endorsing his analysis and that he had not used the methodology provided in the HUD guidelines (which suggests rent of 75 to 85% of EBITDAR rather than his 50%).[4] Further, while he testified he had used the methodology before, there was no evidence that any other expert in the field had. As a result, we are unable to accept the testimony of the Debtor's expert as reliable.[5]

In contrast, Litchfield's expert was more credible. He was a certified appraiser, had done many fair rental value appraisals in this industry, wrote articles and taught courses on valuation methods. He had testified as a valuation expert in this area many times before and his overall testimony was much more credible. His analysis of the value of the facilities in this case was based on accepted and widely used methodologies, comparison of rent to projected earnings and a review of market comparables. He reviewed the actual historical financial performance at these facilities and did an analysis of the basis for that performance (including patient mix). He also looked at the most recent months of the Debtors' performance and noted that they were 6 to 7% higher than the historical numbers on which his estimate of value was based, thereby lending credibility to his conclusions. He also did a more extensive market comparison than did the Debtors' expert, relying on actual leases and sales of nursing homes, which confirmed his opinion of the fair rental value of these facilities. As a result of his analysis, Litchfield's expert concluded that

---

**4.** Litchfield argues that the Debtors' expert opinion is also contradicted by the fact that the Debtors themselves have sought to assume leases at rental rates in excess of 50% of EBITDAR (and in some instances, 85 to 100% of EBITDAR). We do not consider what a debtor does in bankruptcy to be relevant to the issue of the fair rental value of property. Because of the countervailing effects of the debtor's poor and uncertain financial condition and its ability under section 365 to assume or reject a lease *cum onere,* the terms on which a debtor assumes a lease is not a typical "market" transaction.

**5.** Litchfield had filed a motion to exclude the Debtor's expert testimony on the basis that it did not satisfy the *Daubert* standards for giving an expert opinion. *See, e.g., Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We denied that motion and allowed the testimony, reserving Litchfield's objections for determination of the weight to be accorded his testimony. As noted above, we now conclude that the testimony of the Debtors' expert can be given little weight as it does not comport with any accepted methodology that has been subjected to review or use by peers.

the fair rental value for the facilities was $20.8 million.

The Debtors argue that the testimony of Litchfield's expert was not credible because it used actual results for 2001 rather than the Debtors' projections for 2002. They argue that he, therefore, failed to take into account several factors which are relevant to (and will depress) revenues for 2002. The first is the potential effect of the failure of Congress to rescind additional Medicare cuts which were due to go into effect September 30, 2002. We do not give this factor any weight, however, since the Debtors only operated the facilities until October 31, 2002, when they were transferred to the new operators. Thus, the anticipated cuts will have minimal effect on the revenues for the period at issue in this case.

The second factor which the Debtors assert Litchfield's expert ignored is the medical malpractice crisis being faced by this industry. In fact, the Debtors' representative testified that the Debtors are unable to obtain insurance at any price and that the projections are based on actual claims which the Debtors will have to pay from revenues. While Litchfield's expert testified that this factor is included in the market comparables, the Debtors argue that all his comparables are pre-March 2001, long before the insurance crisis was known or fully manifested. However, as noted above, we cannot accept the Debtors' estimate of the effect of this factor (an additional $5.7 million in costs). The Debtors' figure is based on claims across all its facilities and is not limited to the facilities in question here. Further, since the Debtors' evidence was presented in the form of projections, it was not clear when (or if) the Debtors' insurance expired in 2002. Therefore, we are unable to conclude, as the Debtors assert, that the pro-

jected increase in claims manifested itself before the transfer of the Leases.

Based on the expert testimony presented, we are persuaded by the credible testimony of the Litchfield expert, that the fair rental value of these facilities is currently $20.8 million per annum. Therefore, we conclude that the Debtors are obligated to pay Litchfield, for the fair use and occupancy of the facilities post-rejection until transfer to new operators, rent in the annualized amount of $20.8 million.

## IV. *CONCLUSION*

For the reasons set forth above, we grant the Motion of Litchfield to Compel and direct the Debtors to pay Litchfield rent in the amount of $20.8 million per annum prorated for the period from the effective date of rejection of the Leases until the facilities were transferred to new operators.