

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-4-1998

# In Re: Trans World v.

Precedential or Non-Precedential:

Docket 97-7116,97-7148

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"In Re: Trans World v." (1998). *1998 Decisions.* Paper 100.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/100

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 4, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7116

IN RE: TRANS WORLD AIRLINES, INCORPORATED,
      Debtor

INTERFACE GROUP-NEVADA, INCORPORATED,
      Appellant

v.

TRANS WORLD AIRLINES, INCORPORATED

THOMAS E. ROSS,
      Trustee

No. 97-7148

IN RE: TRANS WORLD AIRLINES, INCORPORATED,
      Debtor

INTERFACE GROUP-NEVADA, INCORPORATED

v.

TRANS WORLD AIRLINES, INCORPORATED,
      Appellant

THOMAS E. ROSS,
      Trustee

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 94-cv-00593)

Argued October 27, 1997

Before: SLOVITER, NYGAARD and KRAVITCH,*
Circuit Judges

(Opinion Filed May 4, 1998)

P. Gregory Schwed (Argued)
Loeb & Loeb
New York, N.Y. 10154

Kevin Gross
Rosenthal, Monhait, Gross &
 Goddess
Wilmington, DE 19899

 Attorneys for Appellant/Cross-
 Appellee

Ronald E. Barab (Argued)
Stephen M. Forte
Smith, Gambrell & Russell
Atlanta, GA 30309

William H. Sudell, Jr.
Derek C. Abbott
Morris, Nichols, Arsht & Tunnell
Wilmington, DE 19801

 Attorneys for Appellee/Cross-
 Appellant

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Interface Group-Nevada, Inc. appeals from an order of the United States District Court for the District of Delaware entered in connection with the Chapter 11 proceeding of Trans World Airlines, Inc. ("TWA") which rejected Interface's
_____

* Hon. Phyllis A. Kravitch, Senior United States Circuit Judge for the Eleventh Circuit, sitting by designation.

claim for interest on its administrative claims, rejected its claim for liquidated damages, and rejected some of the elements in its calculation of its actual damages. TWA cross-appeals from the failure to dismiss Interface's unsecured claim and from the calculation of Interface's damages.

I.

The material facts underlying this appeal are not in dispute. Interface, which is in the business of, among other things, arranging and packaging vacation tours, purchased two 1973 Lockheed L-1011s in 1988 from the Manufacturer's Hanover Trust Company, which had been leasing the planes to TWA. Interface paid a total of $25,200,000 for the two planes, financing 100% of the purchase price. By agreement dated March 22, 1988, Interface then leased the planes to TWA. These two planes lie at the center of this dispute.

Though TWA initially met its obligations under the lease, it ceased paying rent on the two L-1011s sometime in late 1990 or early 1991. Interface brought suit and obtained an order of attachment for the planes from a California state court. Thereafter, negotiations between TWA and Interface resumed and culminated in the execution of a new lease dated May 1, 1991. Many of the terms of the 1991 lease ("the lease") remained unchanged from the prior terms. Some changes were made, however, including a reduction in the monthly rent from $175,000 to $160,000 per plane and an extension of the lease term to January 31, 1996. The new lease also added a provision entitling Interface to withhold as a form of security deposit approximately $1,478,000 that it owed to TWA for work that TWA had performed on other Interface aircraft until TWA completed a major maintenance overhaul (known as an "OP-16") on the two L-1011s. In addition, the lease contained a stipulation from TWA that the liquidated damages provision contained in the original lease was valid, reasonable and enforceable.

On January 31, 1992, TWA voluntarily filed for protection in bankruptcy under Chapter 11 of the United States

3

Bankruptcy Code. Two months later, it defaulted on the lease payments to Interface due April 1, 1992. Within days, TWA moved for, and the bankruptcy court signed, an order pursuant to 11 U.S.C. S 1110 ("the S 1110 agreement") dated April 3, 1992 and effective March 31, 1992, authorizing TWA to make whatever payments were necessary to cure its past default and to continue to meet its obligations coming due under the lease on or after March 31, 1992. In addition, the order made clear that TWA was not assuming the lease pursuant to section 365 of the Bankruptcy Code, but was retaining its right to petition the court for an order authorizing either the assumption or rejection of the lease in the future.

Pursuant to the S 1110 agreement, TWA cured its default and continued to make all payments through September 1, 1992, covering the month ending September 30, 1992. TWA made no payments after that, however, and went into default. It then took the aircraft out of service as of October 24, 1992, but continued to use the Interface engines on other planes in its fleet. On November 12, 1992, the bankruptcy court granted TWA's motion to reject the lease. Nevertheless, TWA did not make the aircraft available to Interface until December 3, 1992. At that time, Interface requested TWA to keep the two planes until after the Christmas holiday, and took actual physical possession of the aircraft on December 29 and 30, 1992.

TWA concedes that the planes were returned in worse mechanical condition than required under the lease. After repossessing the aircraft, Interface attempted to mitigate its damages by either selling or leasing the planes, but there had been a precipitous downturn in the airline industry, and its efforts were unavailing. As a result, Interface was forced to place the two L-1011s in long-term or "deep" storage in Arizona.

On November 13, 1992, the day after TWA rejected the lease, Interface filed a claim for administrative expenses incurred as a result of TWA's breach of the S 1110 agreement and its rejection of the lease. Interface amended its claim on September 23, 1993.

At the hearing in the bankruptcy court on Interface's Motion for Immediate Payment of Administrative Rent,

4

Interface argued that it was entitled to the liquidated damages provided for in the lease as a result of TWA's breach. Interface contended that in the alternative it was entitled to recover its actual damages for the loss of rent, the return condition maintenance work not performed, and the costs associated with its storage of the planes and attempts to re-market them. All of these were sought as administrative expenses.

In opposition, TWA first argued that Interface's unsecured claim should be dismissed for Interface's failure to file a proper proof of claim. After the bankruptcy court rejected that argument, TWA contended, inter alia, that (1) the liquidated damages provision was void as contrary to public policy, (2) Interface's administrative claim should be limited to lost rent for the period from October 1, 1992 to October 24, 1992, the date that TWA allegedly took the planes out of service, (3) Interface failed to mitigate its damages, and (4) Interface's loss as a result of the condition of the aircraft on return should be offset by the $1,478,000 security deposit it was holding for the OP-16 overhauls TWA had been obliged to perform at a future date.

In a brief oral opinion, the bankruptcy court concluded that (1) the liquidated damages provision was penal rather than compensatory and, therefore, was unenforceable, (2) Interface's attempt to mitigate its damages was sufficient, (3) the planes, or at least their engines, were being used by and were of value to TWA through December 3, 1992, (4) Interface was entitled to administrative status on the rents owing from October 1, 1992 through December 10, 1992, (5) damages resulting from the return condition maintenance deficiencies and from rents accruing after December 10, 1993 were recoverable only as unsecured claims, (6) the monthly rent recoverable would be $133,000 per plane as opposed to the $160,000 provided for in the lease, (7) Interface was entitled to damages resulting from TWA's maintenance deficiencies in the amount of $1,175,149, and (8) the amount of Interface's unsecured claim would be offset by the $1,478,000 "reserve maintenance deposit" held by Interface.

The parties then submitted an order embodying the bankruptcy court's rulings. The order, "approved as to

5

form" by counsel for Interface, granted Interface an unsecured claim of $9,453,231 and an administrative claim of $617,918, representing $133,000 per month per plane from October 1, 1992 -- the date of the breach-- through December 10, 1992. In addition, the order provided that "Interface's Motion for Payment of Administrative Rent is, except as resolved by the foregoing provisions of the Order, hereby denied." App. at 581. The order was signed by the bankruptcy court on September 8, 1994.

When the order was appealed to the district court, that court first referred the matter to a magistrate judge, who prepared a report and recommendation. Both parties filed objections thereto in the district court. In a thorough opinion, the district court reviewed the magistrate judge's report and recommendation de novo and made the following ten findings: (1) the bankruptcy court did not abuse its discretion in permitting Interface to pursue a general unsecured claim; (2) the proper time period for Interface's administrative claim was from the date of the breach through the date on which TWA made the planes available to Interface or, in other words, October 1, 1992 through December 3, 1992; (3) the bankruptcy court erred in denying administrative expense status to the damages flowing from TWA's failure to meet the return maintenance conditions; (4) Interface's claim for unjust enrichment concerning the maintenance conditions was meritless; (5) the liquidated damages provision of the lease was unenforceable; (6) the bankruptcy court did not err in reducing the stream of future rents to their present value; (7) Interface's request for interest on its administrative claim was not properly presented to the bankruptcy court or to the district court on appeal and, therefore, was waived; (8) Interface's claim for "super-priority" administrative treatment under 11 U.S.C. S 507(b) was likewise waived; (9) Interface was entitled to an unsecured, prepetition claim for its costs associated with storing the aircraft after repossessing them; and (10) the bankruptcy court erred in setting off the $1,478,000 OP-16 security deposit against Interface's unsecured claim because TWA had not performed an OP-16 overhaul on either plane.

On appeal, Interface contends that (1) the district court erred in holding its claim for interest was waived, (2) the

6

lease's liquidated damages provision is enforceable because it does not exact a penalty, and (3) the bankruptcy court's award of actual damages was clearly erroneous because the bankruptcy court (a) improperly reduced the amount of the administrative monthly rent from $160,000 as provided in lease to $133,000 and (b) improperly awarded Interface $189,000 for only one "C" maintenance check while TWA had failed to perform a "C" check on either plane in breach of its obligations under the lease.

In its cross-appeal, TWA argues that (1) Interface's entire unsecured claim should have been disallowed on account of its failure to file a proper proof of claim, (2) the district court erred in holding that the damages resulting from TWA's failure to meet the return maintenance conditions constituted an administrative expense, and (3) the district court erred in refusing to permit TWA to offset the $1,478,000 "maintenance deposit" against Interface's recovery for the breach of the return condition provisions of the lease.

II.

Because the district court sat as an appellate court reviewing an order of the bankruptcy court, our review of its determinations is plenary. In re Continental Airlines, 125 F.3d 120, 128 (3d Cir. 1997), cert. denied, 118 S. Ct. 1049 (1998). "In reviewing the bankruptcy court's determinations, we exercise the same standard of review as the district court," Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1223 (3d Cir. 1995), that is, we review the bankruptcy court's legal determinations de novo, its factual findings for clear error and its exercise of discretion for abuse thereof. In re Engle, 124 F.3d 567, 571 (3d Cir. 1997) . We have jurisdiction over the appeal pursuant to 28 U.S.C. S 158(d).

A.

We consider first whether the district court erred in refusing to address Interface's request for interest on the administrative portion of its claim. In declining to do so, the district court stated that the bankruptcy court had not

7

addressed the issue, Interface had never explicitly requested a ruling from the bankruptcy court, and Interface "approved as to form" the bankruptcy court's order, which did not include an award of interest. In addition, the district court noted that, on appeal to it, Interface had not listed the issue of its entitlement to interest on its administrative claim in its Statement of Issues on Appeal and had raised the issue only in the conclusion to its brief in the district court. Thus, the court concluded that Interface had waived the issue before both courts. In the course of reaching this conclusion, the court highlighted the novelty and complexity of the issue and recognized that the various courts that have addressed it have taken differing approaches and have reached different conclusions. Noting also that the bankruptcy court had not had the opportunity to apply its unique expertise in deciding the issue, the district court declined to exercise its discretion to address such a claim.

In order to put the issue of waiver in perspective, it is necessary to review briefly the issue found to be waived. Both the bankruptcy court and the district court had granted Interface administrative status on the rents owing from October 1, 1992 through early December, 1992, with the district court reducing the end of the period from December 10 to December 3. The district court, unlike the bankruptcy court, held Interface was also entitled to an administrative claim for its damages for TWA's failure to return the planes in the condition specified in the leases. These two figures constitute the administrative claim on which Interface contends it was entitled to interest.

Entitlement to interest on an administrative claim is an issue that this court has never addressed. As the district court recognized, the question whether to award interest on an administrative trade debt is an issue of considerable complexity that has engendered a wide array of approaches and conclusions in the courts. The Bankruptcy Code does not expressly address the issue. As a result, courts have attempted to resolve the issue by turning to pre-Code case law, analogizing to the treatment of awards of interest on tax claims and balancing the interests that animate much of the Code -- namely, the necessity of encouraging

8

creditors to continue dealing with bankrupt debtors and the often antagonistic concern not to deplete the estate through excessive awards of high priority administrative claims. As one of our sister circuits has stated "the diversity of approaches indicates the complexity of the issue." In re Colortex Indus., 19 F.3d 1371, 1377 (11th Cir. 1994) (concluding that interest is recoverable on administrative trade debts). But see In re United Trucking Serv., Inc., 851 F.2d 159, 164–65 (6th Cir. 1988) (noting division among the courts and concluding that the allowance of interest is usually not appropriate).

In this context we examine whether Interface fairly placed the novel and complex claim of its entitlement to interest on its administrative claim before the bankruptcy court and the district court. Interface contends that it preserved its claim for interest in the bankruptcy court both in its proof of claim and in the proposed pretrial order. In its amended proof of claim, Interface listed the administrative claim it was seeking as "$22,517,867.00 (+ interest) [At least]." App. at 72 (brackets in original) (emphasis added). Elsewhere in its amended proof of claim, Interface again stated that it was seeking an administrative claim in the amount of "$22,517,867.00 (plus interest)" (emphasis added). There was no reference to interest other than the two underlined above. The proposed joint pretrial order states merely that "Interface seeks interest and legal fees, as provided in the Lease and by law." App. at 34. Interface contends that it had no further opportunity to press its demand before the bankruptcy court.

We have substantial question whether these slight references really were sufficient to give the bankruptcy court notice that Interface was seeking an award of interest on the administrative claim. However, the bankruptcy court itself, when reading from the proof of claim, noted at the hearing that Interface claimed "$22,517,867, plus interest." App. at 403. Although we believe the district court may have reasonably concluded Interface did not give the requisite notice of its claim to the bankruptcy court, in light of Interface's reference to interest in both its proof of claim and the joint pretrial order, and the bankruptcy court's reference to the claim for interest, we prefer to rest our

9

holding on a different ground, i.e., Interface's failure to preserve the issue in the district court.

Bankruptcy Rule 8006 requires a party appealing to the district court to file a "statement of issues to be presented" on appeal within ten days of the bankruptcy court order. Fed. R. Bankr. P. 8006. Interface timely filed such a statement and listed ten separate issues. Not one of those issues contended that the bankruptcy court erred in failing to award interest on the administrative claim.

Interface argues that the sixth issue listed, which asks "[d]id the Bankruptcy Court err in limiting Interface's administrative claim to only $617,918," is broad enough to encompass its claim for interest. We do not agree. The issue of the amount of the administrative claim and the issue of whether interest is awardable on that claim are conceptually distinct issues implicating very different factual and legal analyses.

In addition to Rule 8006, Bankruptcy Rule 8010 is also designed to assure that the district court is fully advised as to the contentions of the party on appeal from the bankruptcy court. Rule 8010 requires that all appellate briefs filed in the district court contain a statement of the issues presented, and requires that the argument section of the appellant's brief "shall contain the contentions of the appellant . . . ." Fed. R. Bankr. P. 8010(a)(1)(C),(E).

This rule was modeled after Rule 28 of the Federal Rules of Appellate Procedure, see Fed. R. Bankr. P. 8010, advisory committee notes, and, like Rule 28, "is not only a technical or aesthetic provision, but also has a substantive function--that of providing the other parties and the court with some indication of which flaws in the appealed order or decision motivate the appeal." In the Matter of Gulph Woods Corp., 189 B.R. 320, 323 (E.D. Pa. 1995) (looking to cases interpreting Rule 28 for guidance in interpreting Rule 8010). See also In re Suncoast Airlines, Inc., 188 B.R. 56, 58 n.2 (S.D. Fla. 1994) (same). Thus, a district court may, in its discretion, deem an argument waived if it is not presented in accordance with Rule 8010. See In re Brown Family Farms, Inc., 872 F.2d 139, 142 (6th Cir. 1989). We therefore review the district court's determination for abuse of discretion. Id.

10

As the district court correctly stated, Interface did not mention the issue of the appropriateness of an award of interest until the conclusion of its 40 page brief. The conclusion read, in its entirety: "For the reasons stated above, it is respectfully requested that Interface's claim be allowed, as summarized in Schedule A, along with attorneys' fees and interest." A footnote to the conclusion then provided simply that "[i]nterest on administrative trade debt is allowable as an administrative claim. In re Colortex Indus., 19 F.3d 1371 (11th Cir. 1994)." Finally, the schedule referenced in the conclusion stated in a footnote that "[t]o the extent deemed administrative, all amounts should bear interest (See `Conclusion')."

In clear disregard of the mandate of Rule 8010, Interface did not set forth the issue in a statement of issues presented and did not reference this issue anywhere in the argument section of its brief. Moreover, the scant references to the issue that were made in the brief failed to specify whether the bankruptcy court had awarded interest or had discussed the issue to any extent. Indeed, the references in the conclusion do not even suggest whether Interface was asking the district court to affirm or reverse.

In light of this record, it is not surprising that the magistrate judge, to whom the case was referred, failed to make any reference to interest in her Report and Recommendation to the district court. Thus, we cannot say that when Interface raised this issue in its objections to that Report, the district court abused its discretion in holding that Interface had waived its request for interest on its administrative claim.

When the district courts are sitting on appeal, they are entitled to the same full exposition of the parties' contentions that we have repeatedly insisted on for ourselves. See Reynolds v. Wagner, 128 F.3d 166, 178 (3d Cir. 1997) ("an argument consisting of no more than a conclusory assertion . . . will be deemed waived"); (Southwestern Pa. Growth Alliance v. Browner, 121 F.3d 106, 122 (3d Cir. 1997) ("appellate courts generally should not address legal issues that the parties have not developed through proper briefing"); Commonwealth of Pa. v. HHS, 101 F.3d 939, 945 (3d Cir. 1996) (arguments mentioned in

11

passing but not squarely argued will be deemed waived)).
See also United States v. Voigt, 89 F.3d 1050, 1064 n.4 (3d
Cir.) ("The failure to raise a theory as an issue on appeal
constitutes waiver . . . [and] briefs must contain statements
of all issues presented for appeal, together with supporting
arguments. . .." (emphasis in original) (internal citations
omitted), cert. denied, 117 S. Ct. 623 (1996); Nagle v.
Alspach, 8 F.3d 141, 143 (3d Cir. 1993) ("When an issue is
either not set forth in the statement of issues presented or
not pursued in the argument section of the brief, the
appellant has abandoned and waived that issue on
appeal"); Lunderstadt v. Colafella, 885 F.2d 66, 78 (3d Cir.
1989) (a "casual statement" cannot serve to preserve an
issue on appeal where it is contained in neither the
statement of issues on appeal nor the argument section of
the brief).

Interface, apparently in recognition of the force of TWA's
waiver contention, argues that even assuming that the
issue had not been presented below, this court should
nevertheless reach and decide it because it is a pure legal
issue. In light of Interface's failure to raise the issue
appropriately in the district court, we decline to address it
here.

B.

Second, Interface argues that both the bankruptcy court
and the district court erred in holding the liquidated
damages clause in the lease to be unenforceable. The
liquidated damages provision provides:

> SECTION 17. REMEDIES. Upon the occurrence of any
> Event of Default . . . Lessor may, at its option, declare
> this Lease to be in default and at any time thereafter,
> . . . Lessor may do one or more of the following with
> respect to all or any Aircraft as Lessor . . .
>
> (c) . . . Lessor, by written notice to Lessee specifying a
> payment date . . . , may demand that Lessee pay to
> Lessor, on the payment date specified in such notice,
> as liquidated damages for loss of a bargain and not as
> a penalty . . . , (x) an amount equal to any unpaid
> Monthly Rent for such Aircraft due for periods prior to

12

the Rental Payment Date specified in such notice plus which ever of the following amounts Lessor, in its sole discretion, shall specify in such notice . . . : (i) an amount equal to the excess, if any, of the Termination Value for such Aircraft, computed as of the Rental Payment Date specified for payment in such notice, over the aggregate fair market rental value . . . of such Aircraft for the remainder of the Term for such Aircraft after discounting such fair market rental value monthly for the remainder of the Term . . . ; or (ii) an amount equal to the excess, if any, of the Termination Value for such Aircraft as of the date specified in such notice over the fair market sales value . . . as of the Rental Payment Date specified for payment in such notice.. . .

App. at 639 (emphasis added).

In addition, the lease states:

> SECTION 18.2 WARRANTY AND ACKNOWLEDGMENT
> OF VALIDITY OF THE LIQUIDATED DAMAGES
> CLAUSE 17. TWA . . . herewith represents, warrants and agrees that the liquidated damages clause found at Section 17 of this New Lease (as was Section 17 of the Old Lease) is valid, enforceable and negotiated at arms length by parties of equal bargaining power, with the harm difficult to estimate, and based on reasonable valuations as known or possible in the future. TWA . . . shall indemnify and defend Lessor, and each of its successors, in the defense of Lessor's assertion of Section 17.

App. at 702 (emphasis added).

The lease contains a choice of law provision calling for the application of New York law. New York's law regarding the enforceability of liquidated damages provisions is well-defined. "A liquidated damages provision has its basis in the principle of just compensation for loss" in the event of breach. Truck Rent-A-Center, Inc., 361 N.E.2d 1015, 1018 (N.Y. 1977). As a general matter, such provisions are enforceable "provided that the clause is neither unconscionable nor contrary to public policy." Id. See also LeRoy v. Sayers, 635 N.Y.S.2d 217, 222-23 (App. Div. 1995).

13

At the same time, the public policies of New York are "firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." Truck Rent-A-Center, Inc., 316 N.E.2d at 1018. Thus, the law has developed that

> [a] contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. . . . If however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced.

Pyramid Centres & Co., Ltd. v. Kinney Shoe Corp., 663 N.Y.S.2d 711, 713 (App. Div. 1997) (internal citations omitted) (emphasis added).

Courts must apply this analysis from the parties' perspective as of the date of the contract rather than from the date of the breach, Truck Rent-A-Center, Inc., 361 N.E.2d at 1019, and must resolve all doubts in favor of a construction that invalidates the provision as a penalty, Pyramid Centres & Co., 663 N.Y.S.2d at 713.

Applying these standards, the bankruptcy court held that the liquidated damages provision did not bear a reasonable relationship to Interface's actual damages and was an unenforceable penalty. In like vein, the district court concluded that the liquidated damages provision of the lease was unenforceable on the ground that actual damages were easily calculable and the provision, when written, bore no relation to Interface's anticipated actual damages. Dist. Ct. Op. at 22-29.

Although the language of the liquidated damages provision appears complex at first blush, its operation is straightforward and depends upon the ascertainment of two figures. One figure is the "termination value" of each aircraft, which represents the predicted value for each plane at specific dates in the future. This figure is predetermined in the lease. The other figure is the fair market rental value discounted to present value or the resale value of the aircraft at the time of the breach. The formula for liquidated damages set in S 17(c) is that, upon

14

breach, TWA would have to pay the predetermined termination value less either the fair market rental value, the option under S 17(c)(1), or the resale value, the option under S 17(c)(ii).

The termination value set by the lease for each plane in late 1992 was $13,500,000. From that figure would be subtracted either the fair market rental value for the remainder of the lease or the resale value as of October 1992. In late 1992, the airline industry was severely depressed and Interface's expert estimated the resale value of the planes to be $7,000,000 each and the fair market rental value to be $5,314,116 (39 remaining payments at a fair market rent of $100,000 per month). TWA's expert arrived at similar, though slightly higher, figures.

We do not purport to explain what motivated the parties to arrive at this formula for liquidated damages. As is evident from the calculations above, they simply have no bearing on Interface's probable loss in the event of breach. Interface has never explained to this court, and certainly not to the satisfaction of either the bankruptcy or district court, why actual damages could not be ascertained upon breach. Indeed, to approximate Interface's probable loss, the parties needed only to total the remaining rental payments plus the consequential or incidental damages Interface was likely to incur in mitigating its damages or storing the aircraft. As Interface forthrightly states, however, "[t]hrough S 17(c), Interface sought to protect its multi-million dollar aircraft investment by shifting to TWA the risk of a market drop in the Aircraft's value. If TWA defaulted during the Lease, and delivered to Interface severely depreciated Aircraft, TWA would be responsible for making up the difference." Interface Br. at 28.

To illustrate the effect of the liquidated damages provision in S 17(c), albeit in an improbable hypothetical, if TWA were to breach with one month remaining on the lease, actual damages would be approximately one month's rent per plane. Under S 17(c)(ii), however, TWA would owe the termination value of $12,500,000 minus the resale value at that time. Thus, using 1992 values, TWA would owe $5,500,000 as liquidated damages per plane. Similarly, under S 17(c)(i), TWA would owe the termination value of

$12,500,000 minus one month's rent of approximately $100,000, for a total of $12,400,000 per plane.

We believe that New York's public policy is intended to avoid precisely this type of penalty. See Truck Rent-A-Center, Inc., 361 N.E.2d at 1018 ("A clause which provides for an amount plainly disproportionate to real damage is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion. A promisor would be compelled, out of fear of economic devastation, to continue performance and his promisee, in the event of default, would reap a windfall well above actual harm sustained."); LeRoy, 635 N.Y.S.2d at 222-23 ("In arriving at a stipulated sum as liquidated damages, there must be some attempt to proportion damages to the actual loss.").

Interface, citing S 18.2 of the lease, apparently would have us disregard the requirement of proportionality because TWA expressly agreed to the formula as valid and enforceable. Specifically, Interface contends that TWA was well represented and enjoyed equal bargaining power, that TWA never objected to the reasonableness of the liquidated damages provision or requested that it be taken out of the lease and that consequently, it is "unseemly" for TWA now to claim that the provision is unenforceable. Interface Br. at 24.

Although the district court initially expressed some "concern" in light of S 18.2, ultimately it found that concern was not enough to render an otherwise invalid provision enforceable. Arguing to the contrary, Interface cites several cases in which the courts have noted that the contracts at issue containing a liquidated damages provision were freely negotiated between parties with equal bargaining power. In re United Merchants, 674 F.2d 134, 144 (2d Cir. 1982) (applying New York law); Walter E. Heller & Co. v. American Flyers Airline Corp., 459 F.2d 896, 899 (2d Cir. 1972) (applying New York law); Rattigan v. Commodore Int'l, 739 F. Supp. 167, 172 (S.D.N.Y. 1990) (applying New York law). See also Truck Rent-A-Center, Inc., 361 N.E.2d at 1019-20; Leasing Serv. Corp. v. Justice, 673 F.2d 70, 74 (2d Cir. 1982) (applying New York law). In each of those cases, however, the fact that the parties enjoyed equal bargaining

16

power was offered simply as additional support for upholding a liquidated damages provision that was otherwise reasonable and valid.

Interface does not cite any case in which a court enforced an otherwise invalid liquidated damages provision merely because it was freely negotiated by sophisticated parties. Contracts that are void as against public policy are unenforceable regardless of how freely and willingly they were entered into. See Restatement (Second) Contracts Ch. 8, Intro. Note (1981) (public policy concerns "touch upon matters of substance related to the public welfare rather than aspects of the bargaining process between the parties."); cf. Sternaman v. Metropolitan Life Ins. Co., 62 N.E.2d 763, 764 (N.Y. 1902) ("Parties cannot make a binding contract in violation of law or of public policy."). The mere fact that TWA warranted the enforceability of the provision cannot negate the underlying public policy.

Accordingly, we will affirm the district court's order holding that the liquidated damages provision contained in the lease is unenforceable.

C.

Interface next challenges the amount of two items of actual damages awarded to it.

1.

The bankruptcy court's order effective March 31, 1992, granting TWA's application under S 1110 effectively approved TWA's promise to continue to perform its obligations to Interface under the lease. Nonetheless, when the bankruptcy court included as an administrative expense the monthly rent TWA owed for the period of October 1, 1992 until early December, 1992, it reduced the rent of $160,000 a month provided in the lease to $133,000. The issue before us is whether, in the event of a breach of a S 1110 agreement, the amount recoverable as administrative rent should be the amount provided for in the lease (here $160,000 per month), as Interface argues, or the fair market rental value of the property at the time of

17

the breach, representing the objectively reasonable value to the estate, as TWA argues. This presents an issue of first impression in this circuit, which implicates the scope of S 1110 of the Bankruptcy Code.

To resolve the issue, we first must examine the relationship among four different sections of the Bankruptcy Code: SS 362, 365, 503 and 1110. Under S 362(a), once a debtor files a petition in bankruptcy, an automatic stay is imposed on claims against the debtor's property. 11 U.S.C. S 362(a). Thus, if the debtor is performing as lessee under an unexpired lease at the time it files a Chapter 11 petition, the lessor subsequently cannot enforce its rights under the lease against the debtor until the automatic stay is lifted by the court or a plan of reorganization is confirmed. See 11 U.S.C.S 362(c),(d).

Once the petition has been filed, S 365 allows a trustee or debtor-in-possession, subject to court approval, to "assume" or "reject" an unexpired lease at any time prior to confirmation of the debtor's plan for reorganization. 11 U.S.C. S 365(a),(d)(2); see Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 43 (3d Cir. 1989). If the lease is assumed, i.e., the debtor and the court having agreed that the continuation of the lease is in the best interest of the debtor's reorganization and continuation, the debtor is entitled to receive the benefits under the lease but, at the same time, is responsible for performing its obligations thereunder. In re Columbia Gas Sys. , 50 F.3d 233, 238-39 & n.8 (3d Cir. 1995). Should the debtor breach thereafter, all future payments due under the remainder of the lease become administrative expenses with administrative priority. Id.

If the lease is rejected, a creditor's claim for the stream of future rental payments due under the now-rejected lease is denied post-petition administrative status and is treated as an unsecured prepetition claim. Id. at 238 n.8. Where the debtor continued to use the leased property prior to rejection, it is liable for the rental payments accruing during the period of use, and that obligation is treated as a S 503 post-petition administrative expense. However, the amount treated as an administrative expense would not necessarily be the rent provided for in the lease, since

18

administrative expenses are allowable only for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. S 503(b)(1)(A). Thus, it is well-settled that under S 503 the debtor is responsible for only the fair market value of the property at the time of its use.1 See generally In re Zagata Fabricators, Inc., 893 F.2d 624, 627 (3d Cir. 1990); Sharon Steel Corp., 872 F.2d at 42-43.

Congress has provided a somewhat different scheme for the airline industry. Under S 1110 of the Bankruptcy Code, lessors of aircraft, inter alia, may avoid the automatic stay and retake possession of the leased equipment unless the airline takes certain required steps.

Section 1110 provides, in relevant part:

> The right . . . of a lessor . . . of . . . aircraft . . . leased to . . . a debtor that is an air carrier . . . to take possession of such equipment in compliance with the provisions of a . . . lease . . . is not affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession, unless--
>
> (1) before 60 days after the date of the order for relief under this chapter, the trustee [or debtor-in-possession], subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after such date under such . . . lease . . .

11 U.S.C. S 1110(a) (emphasis added). In addition, the debtor must agree to cure all prior defaults and all future defaults within 30 days of their occurrence. Id.

As is evident, S 1110 subtly alters the interplay between the provisions discussed above in the context of aircraft and aircraft equipment financing. Section 1110 was designed in part to increase availability of low-interest capital to the transportation industry. See generally In re Continental Airlines, Inc., 932 F.2d 282, 291 (3d Cir. 1991). Toward this end, S 1110 renders S 362's automatic stay effective for only 60 days following the filing of the petition

_____

1. Because all relevant events underlying the instant appeal occurred prior to 1994, this dispute is governed by the pre-1994 Code. We, therefore, need not consider the 1994 amendments to SS 365 and 1110.

19

in bankruptcy. After that time, the lessor is free to repossess the aircraft in the event of breach by the debtor unless, within those 60 days, the debtor enters into what is referred to as a "S 1110 agreement." If a S 1110 agreement is executed, which requires court approval but not the lessor's consent, the automatic stay remains in effect. In return for this protection, the debtor or its trustee must "perform all obligations of the debtor that become due on or after such date [on which the S 1110 agreement is entered into] under such . . . lease" and cure any prior or future defaults. 11 U.S.C. S 1110(a).

The legislative history to S 1110 provides guidance as to how its invocation affects the operation of the other sections of the Code discussed above.

The House Report stated:

> It should additionally be noted that under section 1110(a) the trustee or debtor in possession is not required to assume the . . . unexpired lease under section 1110; rather, if the trustee or debtor in possession complies with the requirement of section 1110(a), the trustee or debtor in possession is entitled to retain the aircraft or vessel subject to the normal requirements of section 365.

124 Cong. Rec. H11102-03, p. 32405-06 (daily ed. Sept. 28, 1978). A S 1110 agreement, then, operates neither as an assumption nor as a rejection of the entire lease, but rather, obligates the debtor to perform the lease obligations as they come due, in return for the protection of the automatic stay. After the S 1110 agreement is made, the debtor remains free to make a formal assumption or rejection of the lease and, until that time or such time as the S 1110 agreement is breached or terminated, the automatic stay of S 362 remains in effect.

Against the backdrop of this statutory scheme, we turn now to the question presented on appeal. That is, whether Interface's administrative claim for the rental obligations coming due after the S 1110 agreement was entered into but before the planes were returned should be fixed at the $160,000 monthly rent provided for in the lease or whether

20

it should be reduced to the fair market value as would a typical administrative claim under S 503.

The statutory language itself suggests the former. Under the terms of S 1110, if the debtor is to retain possession of the aircraft and continue to reap the benefits of the automatic stay, it must "agree[ ] to perform all obligations. . . that become due. . . under such. . . lease ." 11 U.S.C. S 1110(a) (emphasis added). Interface argues that the phrase "under such . . . lease" indicates Congress's intention to bind the debtor to the terms of its lease, a reading supported by the legislative history to S 1110. There, Congress made clear that

> [t]he sections [1110 and its companion statute 1168, pertaining to railroad rolling stock] protect the interest of the financer by entitling him to payments according to the financing agreement terms or to his equipment. They protect the estate and the reorganization process by leaving the choice of which the financer will get to the trustee. Thus, equipment that the trustee needs to keep operating the business is beyond reach by the financer if the trustee is willing to continue to pay for it according to pre-bankruptcy terms. If the trustee does not need the equipment, he may simply surrender it to the financer.

H. R. Doc. No. 95-595, at 239 (1977), reprinted in 1978 U.S.C.C.A.N., 5963, 6199 (emphasis added). See also 7 L. King, Collier on Bankruptcy P 1110.04 p. 1110-25 (15th ed. Rev. 1997). In addition, Congress indicated that lessors of equipment subject to a S 1110 agreement are assured the same protection as are other lessors after a lease is assumed by the debtor. H. R. Doc. No. 95-595, at 240, reprinted in 1978 U.S.C.C.A.N. at 6199. That is, the lessor is entitled to "payments under the terms of the lease." Id. In our view, these passages leave little doubt that under a S 1110 agreement, the lessor is entitled to the full rent provided for in the lease.

The only other circuit to have addressed a somewhat similar issue reached a similar conclusion. In In re Airlift Int'l, Inc., 761 F.2d 1503, (11th Cir. 1985), the question presented was whether the financer, GATX Leasing Corp.,

21

was entitled to receive the amounts due under the terms of its agreement with the debtor-lessee or the value of the actual use of the aircraft to the debtor. The court determined that, in the context of a S 1110 agreement, the lessor was entitled to the full amount provided for under the terms of the agreement. Id. at 1511 ("The amount of the administrative claim is determined by looking to the amount due under the agreement."). The court in Airlift did not directly address the possibility of awarding the fair market value.

Neither the bankruptcy nor district court in this case held that Interface's recovery should be limited to the value of TWA's actual use of the aircraft, and TWA does not urge that position on appeal. Thus, although Interface relies on Airlift almost exclusively, its holding is not directly apposite.

Nevertheless, the Eleventh Circuit's general approach to the issue is illuminating. That court conceived of a S 1110 agreement as a post-petition agreement to meet prepetition obligations. Id. at 1509. Typically, post-petition contracts in the ordinary course of business may be entered into by the debtor without prior court approval. Therefore, in order to protect the estate from depletion through the enforcement of unnecessary or deleterious post-petition contracts, an administrative claim based on a post-petition contract is subject to the court's power under S 503 to reduce the amount of the claim to the reasonable value of the contract's benefit to the estate. Id. at 1509 n.5. Similarly, in the context of unexpired leases, a bankruptcy court will not have had the opportunity to verify that the terms of an unexpired lease are in fact actual and necessary expenses of the estate prior to the debtor's formal assumption or rejection. Thus, if the debtor rejects the lease, the court may award an administrative claim for the post-petition rents of less than the lease terms if it determines that those terms are significantly disproportionate to the market rates that the debtor could have obtained at the time the petition in bankruptcy was filed.

A S 1110 agreement, however, can be entered into only after a court has determined that the lease obligations represent actual and necessary costs to the estate. Accordingly, having received court approval ex ante, there

22

is no need to subject the agreement to the court's review for a second time upon the submission of a creditor's claim. Id. at 1509, 1510 n.5. TWA's S 1110 agreement was reviewed and approved by the bankruptcy court as being "in the best interests of TWA, its creditors and its estate." App. at 7. Thus, the purpose of S 503 review by the bankruptcy court was fulfilled at that time, and we read SS 503 and 1110 as erecting no further barriers to Interface's receipt of the full rental amounts provided in the lease.[2]

In determining the post-breach monthly rent to which Interface was entitled, the bankruptcy court reduced the monthly rent for the relevant period from $160,000, as provided for in the lease, to $133,000, which was the figure provided by TWA's expert as the fair market rental value of the aircraft in 1992. The district court did not alter that figure. We hold that both courts erred as a matter of law in not awarding Interface an administrative claim for the lease amount of $160,000 per month for the period of October 1, 1992 through December 3, 1992.

2.

Interface also argues that the bankruptcy and district courts erred when calculating its actual damages because they did not include damages for TWA's failure to perform a timely "C" check on one of the two aircraft. Section 5(c) of the lease provides that

> Upon the return of any Aircraft including at the end of the Term with respect thereto, Lessee shall have had with respect to such Aircraft, at its own expense, a "C" check or its functional equivalent completed within 45 days prior to the return of such Aircraft.

_____

2. In response to Interface's suggestion that we follow the Eleventh Circuit's reasoning, TWA attempts to distinguish Airlift on the ground that GATX had voluntarily entered into and consented to the S 1110 agreement with the debtor whereas here, TWA entered into the agreement and obtained court approval to assume the obligations under the lease without Interface's consent. TWA's Br. at 33-35. We believe this is a distinction without a difference and find no reasoned justification for
conditioning a creditor's entitlement to full payment on whether or not it consented to the formation of the S 1110 agreement.

App. at 662. A "C" check is a standard aircraft maintenance overhaul which, according to the parties' joint pretrial order, would have cost TWA $189,000.

TWA stipulated that it performed its last "C" check for aircraft no. N31011 on July 17, 1992 and for aircraft no. N41012 on September 28, 1992. In addition, the district court found, and neither party disputes here, that the "return date," or more precisely, the date on which TWA made the aircraft available to Interface, was December 3, 1992. Thus, while the lease called for "C" checks to be performed within 45 days of the return date, in fact they were performed 139 days and 66 days prior to the return of the aircraft.

For reasons not fully explained, the bankruptcy court granted Interface damages for only one "C" check in the amount of $189,000, and the district court did not alter that determination. Interface argues that it is plainly entitled to damages for TWA's failure to perform a"C" check on the second plane within 45 days of its return, as required under the lease. In opposition, TWA contends that Interface waived this argument on appeal to the district court and that the bankruptcy court's award was not clearly erroneous because, according to TWA, Interface suffered no harm as the required "C" check was performed on that plane only 66 days prior to the date it was made available.

With respect to the alleged waiver, TWA contends that in Interface's appeal to the district court it had argued only that the bankruptcy court had erred in calculating its actual damages, without specifically drawing attention to the "C" check issue. We are not persuaded by TWA's waiver argument. Interface's inclusion in the Statement of Issues on Appeal that the bankruptcy court erred in calculating its actual damages is broad enough to encompass the various instances in which Interface's damages might have been underestimated. Moreover, in the argument section of its opening brief submitted to the district court, Interface argued that the bankruptcy court erroneously awarded it only a portion of its damages flowing from TWA's failure to meet the return maintenance requirements contained in S 5 of the lease. Thereafter, Interface pressed the specific issue

24

of the second "C" check in its reply memorandum, describing its actual damages as "including a clearly overdue `C' check." Although Interface could have made a more detailed argument, we cannot say that the issue was waived.

TWA next argues that Interface was not harmed by its failure to perform the second "C" check within 45 days of the return date and, therefore, that TWA should not be required to pay damages. However, the bankruptcy court made no finding that Interface suffered no harm. Indeed, contrary to TWA's argument, its expert did not testify to that effect.

The bankruptcy court appears to have rejected the claim for the second "C" check on the ground it had not come due by the date TWA rejected the lease. However, the lease required TWA to perform the "C" check within 45 days of the planes' return. TWA's expert agreed the "C" check was not performed within 45 days of the second plane's return. Accordingly, we must conclude that both the bankruptcy and district courts erred in failing to award Interface $189,000 for the second "C" check which was not performed in compliance with the lease.

D.

To conclude, on Interface's appeal we will (1) affirm the district court's conclusion that Interface failed to preserve its claim for interest on its administrative claim, (2) affirm the district court's conclusion that the liquidated damages provision contained in the lease is unenforceable under New York law, (3) reverse the district court's decision, which had adopted the bankruptcy court's decision, to grant Interface's administrative claim for monthly rent in the amount of $133,000 per plane and direct that Interface be granted rent in the full lease amount of $160,000 per plane from October 1, 1992 through December 3, 1992, and (4) reverse the district court's decision, which had effectively adopted the bankruptcy court's decision, denying Interface additional damages of $189,000 for TWA's failure to perform a timely "C" check on the second aircraft, and direct that its claim be increased by that amount. We turn to consider the cross-appeal.

25

III.

A.

TWA raises three issues in its cross-appeal. First, it argues that the district court erred in affirming the bankruptcy court's denial of TWA's motion to dismiss Interface's unsecured prepetition claim as untimely.

Interface filed its "Amended Administrative Proof of Claim" on September 23, 1993, well before the bar date of December 3, 1993 (the last day on which unsecured claims could be filed). However, it had not filed an unsecured claim as such. At the close of Interface's case before the bankruptcy court, TWA moved to dismiss Interface's entire unsecured claim on the ground that Interface hadfiled only an administrative claim and that the unsecured claim had not been filed in time. Interface responded that its September 23, 1993 filing was sufficient to constitute an unsecured proof of claim, that TWA was on notice of Interface's intent to pursue an unsecured claim in the event that its claim or any part thereof was denied administrative expense status, and that TWA had been treating Interface's entire claim as a Class 8 unsecured claim since the claim had been filed. In addition, Interface cross-moved before the bankruptcy court for leave to amend its proof of claim if the court deemed it necessary.

The bankruptcy court ruled as follows:

> The Court is [ ]well-aware of the liberal amendment rules. The sections of the Bankruptcy Code provide that an administrative expense claim may be requested and thus a proof of claim is not required for an administrative expense request. If there is to be a claim under Section 501, I believe it is, there must be a proof of claim filed if, in fact, the debtor's schedules show that claim as being disputed.

> And what we have in Exhibit 41 [Interface's amended proof of claim filed Sept. 9, 1993] is kind of a bastardized claim. It indicates that it is an amended administrative claim. It also checked that there's an unsecured priority claim, which is questionable as to what was meant by that.

　　　　＊　＊　＊

　　　This Court has found that when an administrative
　　　claim is disallowed that that portion for breach of
　　　contract becomes an unsecured claim. Thus, I cannot
　　　grant the motion to dismiss.

App. at 402-04. The district court affirmed on the ground
that TWA "had notice of the substance of Interface's claim
and recognized that the claim might be treated as a
general, unsecured obligation." Dist. Ct. Op. at 9-10.

Bankruptcy Rule 7015 provides that amendments to
claims shall be governed by Rule 15 of the Federal Rules of
Civil Procedure, Fed. R. Bankr. P. 7015, which commits the
decision to grant or deny leave to amend to the trial court's
sound discretion. See generally Coventry v. United States
Steel Corp., 856 F.2d 514, 518 (3d Cir. 1988).

On appeal, TWA does not argue that it was prejudiced by
the bankruptcy court's allowance of Interface's unsecured
claim but rather that because no proper unsecured claim
had been filed before the bar date, any amendment of the
original claim or allowance of the unsecured claim would be
improper. As the bankruptcy court found, however,
Interface's "bastardized" proof of claim was ambiguous in
that it mentioned both an administrative proof of claim and
an unsecured priority claim. App. at 403. As such, we agree
with both the bankruptcy and district courts that
Interface's proof of claim had put TWA on notice that an
unsecured claim had been made against it and could be
pursued. Thus, there is nothing in the record to suggest
that the bankruptcy court's allowance of Interface's
unsecured claim was an abuse of discretion. Cf. In re
Burlington Coat Factory Sec. Lit., 114 F.3d 1410, 1434 (3d
Cir. 1997) (among the grounds justifying denial of leave to
amend are undue delay, bad faith, dilatory motive,
prejudice and futility); Hatzel & Buehler, Inc. v. Station
Plaza Assocs., 150 B.R. 560, 562 (Bankr. D. Del. 1993)
(amendment of a claim under Fed. R. Bankr. P. 7015
should be granted where the purpose is to cure a defect in
the claim as originally filed, to describe the claim with
greater particularity or to plead a new theory of recovery on
the facts set forth in the original claim). We will affirm both
the bankruptcy court and the district court on this issue.

27

B.

TWA next contends that the district court erred in holding that the damage flowing from TWA's failure to meet the return maintenance conditions provided for in the lease would be treated as an administrative claim, thereby reversing the bankruptcy court's determination that it was a prepetition unsecured claim. There is little precedent to help resolve this difficult issue.

Section 5 of the lease specified in detail the condition in which the two L-1011 aircraft were to be returned to Interface. TWA concedes that it failed to meet that requirement. Accordingly, the only question before us is whether TWA's failure to meet the lease's return condition terms gives rise to an administrative rather than an unsecured claim.

TWA reasons that this obligation did not come due before November 12, 1992, the date it rejected the lease, and thus its failure to meet the return conditions requirements should be treated as an unsecured prepetition claim. The bankruptcy court agreed, relying on its opinion in In re Continental Airlines, Inc., 146 B.R. 520 (Bankr. D. Del. 1992), which held that once a lease is rejected, the debtor is no longer bound by its terms. Under In re Continental Airlines, return obligations arising after rejection would only give rise to an administrative claim if the debtor's failure to meet the conditions conferred an actual benefit on the estate. Id. at 527-28. One court of appeals has reached a contrary conclusion. In In re United Trucking Service, Inc., 851 F.2d 159 (6th Cir. 1988), the Sixth Circuit held that the lessee's failure to meet return conditions benefits the estate in the amount that the debtor/lessee would have to pay to meet those conditions and, therefore, the lessor's claim for resulting damages should be given administrative priority. Id. at 162.

In the case before us, the district court reversed the holding of the bankruptcy court on the classification of the return maintenance conditions. The district court noted that in neither In re Continental Airlines nor In re United Trucking Service, had the debtor formally entered into a S 1110 agreement. Dist. Ct. Op. at 16 n.9. That distinction

28

is critical. After TWA entered into the S 1110 agreement, the extent of its duty to perform its obligations under the lease and the ramifications of its failure to do so were controlled by the operation of the S 1110 agreement and by S 1110 itself. See Airlift, 761 F.2d at 1513 ("[t]hough the Note set the parameters of Airlift's obligation, it is the section 1110 agreement that creates the binding contractual obligations of Airlift"). Therefore, cases in which the debtor did not enter into a S 1110 agreement do little to inform our analysis.

TWA's argument that its obligation under the S 1110 agreement ceased when it rejected the lease would stand on somewhat better ground if it had returned the aircraft immediately upon rejection, which it failed to do. Ultimately, however, even then its argument would fail because of the nature of the return condition obligation.

As we held above, as long as the debtor retains the leased property without assuming the lease, it must meet its obligations coming due in accordance with the strictures of S 1110. Cf. In re Airlift, 761 F.2d at 1512 ("If the debtor wishes to stop the payment meter [under a S 1110 agreement], he must return the aircraft . . . ."); 7 L. King, Collier on Bankruptcy P 1110.05[2][a] p. 1110-36 (15th ed. 1997) ("if the obligation that the trustee agrees to perform under section 1110 is an obligation owing pursuant to a lease or executory contract, the trustee's agreement to perform should be enforceable until the time that the trustee formally rejects the lease or contract and surrenders possession").

If the lease obligations are not met, such failure constitutes a breach of the S 1110 agreement giving rise to an administrative claim. One of the lease obligations encompassed in the S 1110 agreement was the obligation under the lease to return the planes in a specified condition. Although the obligation fell due on a specific date, i.e., upon return, it accrued throughout the period of the lease which covered TWA's use of the airplanes during the course of its bankruptcy. It follows that when TWA returned the planes, they had to be in the condition required by the lease. See generally Kathryn Hoff-Patrinos, Aviation Finance Revisited: The 1994 Amendments to

29

Section 1110 of the Bankruptcy Code, 69 Am. Bankr. L. J. 167, 199-200 & n. 144 (1995) (concluding that under a S 1110 agreement, a debtor's failure to meet maintenance and return conditions should be treated as an administrative expense).

Thus, the return condition requirement arose while the S 1110 agreement was in effect and the district court did not err in holding that the damages flowing from TWA's failure to meet those conditions should have been afforded administrative priority.

C.

TWA's final contention on its cross-appeal is that the district court erred in reversing the bankruptcy court's decision to offset the amount of Interface's damages resulting from TWA's failure to meet the lease's return maintenance requirements by the $1,478,000 security deposit that Interface held.

Section 33 of the lease authorized Interface to withhold $1,478,000 that it owed to TWA and to retain that sum as a "maintenance deposit" to be returned to TWA without interest upon TWA's "completion of an OP-16 overhaul . . . on both Aircraft." App. at 708. Under TWA's FAA-approved maintenance program, each overhaul in a progression of increasingly more thorough or "heavier" maintenance overhauls must be performed after a specified number of flight hours. Under S 5(d) of the lease, if a plane, when returned to Interface, was more than 75% of the way to needing the next heaviest overhaul TWA was required to perform that overhaul, even if it would have otherwise been premature.

It is undisputed that OP-16 overhauls would have cost TWA over $2,000,000 per plane. It is also undisputed that TWA never performed an OP-16 overhaul on either aircraft. TWA argues that it is entitled to a setoff in the amount of the deposit because an OP-16 overhaul never came due under TWA's FAA-approved maintenance plan. In response, Interface cites the plain language of S 33 and argues that because the OP-16 overhauls were never performed, it is entitled to retain the security deposit.

Without discussion, the bankruptcy court reduced the amount of Interface's award of damages for TWA's failure to meet the return conditions by the amount of the OP-16 deposit. The district court reversed and concluded that, given the unambiguous language of S 33, Interface was entitled to retain the entire security deposit because TWA had not performed an OP-16 overhaul on either aircraft. Dist. Ct. Op. at 37. We agree. The $1,478,000 was not a general security deposit to protect Interface in the event that TWA failed to meet the return maintenance requirements. Rather, it was a specific deposit, tied only to the performance of the OP-16 overhauls. Whether Interface is entitled to retain the deposit is analytically distinct from and should have no bearing on Interface's recovery for TWA's failure to meet the various return conditions other than the performance of the OP-16 overhauls.

Nothing on the face of S 33 suggests that Interface would have a duty to return the security deposit if TWA were to return the planes before the OP-16 overhauls were due. Thus, S 33 not only protected Interface in the event that TWA failed to perform OP-16 overhauls that were overdue, but shifted to TWA the risk of having to pay for the OP-16 overhauls when due in the future. For example, in the absence of a lease provision such as S 33, if TWA returned the planes immediately before the OP-16 overhauls became due under S 5 of the lease, Interface would have been left to bear the entire cost of the overhauls. Section 33 assured Interface that, in the event of early termination, TWA would bear at least some responsibility for the cost of the overhauls.

Because S 33 reflected a reasonable estimate, ex ante, of the injury that Interface would incur if TWA terminated the lease early, S 33 did not constitute an unenforceable penalty under New York law. See Pyramid Centres & Co., Ltd. v. Kinney Shoe Corp., 663 N.Y.S.2d 711, 713 (App. Div. 1997) (stating that a liquidated damages clause is enforceable if it bears a reasonable proportion to the probable loss and if the amount of the actual loss is difficult to estimate).

Under S 33, the return of the deposit was conditioned on TWA's performance of the OP-16 overhauls and that

31

condition was never satisfied. Accordingly, Interface is entitled to retain the deposit and the district court did not err in reversing the bankruptcy court's order setting off Interface's recovery against it.

D.

To conclude, on TWA's cross-appeal, we will (1) affirm the district court's denial of TWA's motion to dismiss Interface's unsecured claim as untimely filed, (2) affirm the district court's grant of administrative status to Interface's claim for damages flowing from TWA's failure to meet the return conditions, and (3) affirm the district court's decision that TWA was not entitled to offset the $1,478,000 maintenance security deposit held by Interface against Interface's recovery.

We will remand this case to the district court for action in accordance with this opinion. Each party to bear its own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit